**MOUNTAIN FUEL SUPPLY COMPANY,**
Appellee,

v.

**UNITED STATES of America,**
Appellant.

No. 605–70.

United States Court of Appeals,
Tenth Circuit.

Oct. 15, 1971.

Rehearing Denied Dec. 3, 1971.

Grant W. Wiprud, Atty., Tax Div., Dept. of Justice (Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks and Issie L. Jenkins, Attys., Tax Div., Dept. of Justice, and C. Nelson Day, U. S. Atty., of counsel, with him on the brief), for appellant.

J. Wendell Bayles and Edward J. McDonough, Salt Lake City, Utah (Joseph S. Jones and John Crawford, Jr., Salt Lake City, Utah, with them on the brief), for appellee.

Before SETH, ALDISERT,* and McWILLIAMS, Circuit Judges.

SETH, Circuit Judge.

This is an action to recover income taxes paid by the Mountain Fuel Supply Company, for the years 1962, 1963, and 1964. The company is engaged in the business of producing natural gas and operating pipelines for the gathering, transmission, and distribution of natural gas. This appeal concerns two unrelated issues. One is the proper depletion base for the condensate produced by the taxpayer from wells or leases it owns or in which it has an interest. The second issue is whether or not it was proper for the taxpayer to have deducted, under section 162 of the Internal Revenue Code of 1954, as a necessary business expense, certain costs incurred by it in reconditioning portions of its pipeline.

*The Pipeline Reconditioning*

To consider first the issue relating to the deductions made for ordinary and necessary business expense, the record shows that the deductions in issue as made by the company in 1962 amounted to $360,117.81, in 1963 $253,869.47, and in 1964 $456,130.53. Of the total expenditures made by the company in reconditioning segments of its line, $1,070,117.81 was deducted as expense, and $420,963.27 was treated as "new investment." The company operates some 900 miles of transmission lines, about 4,000

---

* Of the Third Circuit, sitting by designation.

miles of distribution lines, and 400 miles of gathering lines. About forty miles of lines were reconditioned during the years in question in the manner hereinafter described. The segments reconditioned were in service at the time, and it was necessary to put them out of service, to remove the gas from the pipe, to dig up the pipe, and remove it from the ground. The trench was then temporarily backfilled. The pipe was then cut into thirty or forty foot sections and hauled to a central location where it was straightened. The old couplings, expansion joints, stubs, old valves, and defective welds which had not been cut out in the field were cut out. The remaining portions were cleaned by the removal with knives and sandblasting of the exterior coating which had been applied when they were originally laid. The interior of the pipe was also cleaned. Small corrosion pits and other small defects were spotwelded, but portions of the pipe which were in such condition that they could not be so repaired were cut out and were replaced by new sections. The pipe sections were beveled, transported back to the original trenches where they were bent where necessary to conform to the terrain, the trench reopened, the sections of pipe welded together, new valves inserted where needed, the pipe coated with coal tar and a fabric covering, replaced in the trench, tested, the trench backfilled, and the segment put into service.

The record shows that of the total length of pipe which was initially removed from the ground, approximately ten per cent thereof was replaced with new pipe and new valves. The new pipe, as indicated above, replaced the portions not considered repairable, the old expansion joints, and the fittings which had been removed. The new valves which were installed were plug valves to replace the original gate valves.

The taxpayer, for the years in question, handled the reconditioning costs on its books and records as follows: The cost of the new pipe to replace the footage discarded, and the cost of new valves was capitalized, as was the relaying cost and the company overhead applicable to such new portions. The cost of digging up and removing the portions of the line which were discarded, less salvage, was charged to depreciation reserve. The cost of recoating and wrapping the old pipe returned to service and the cost of coating and wrapping the replacement portions was capitalized. The cost of digging up, cutting, removing, hauling, straightening, cleaning, spotwelding the corrosion pits, removal of defective sections, beveling, bending, reopening trenches, rewelding, relaying, testing, and burying of all the old pipe returned to service was expensed. Much of the reconditioning was done by independent contractors.

The portions of the corporation's lines with which we are here concerned were laid in 1929, 1930, and 1931. The segments selected for reconditioning were portions of the lines which had a bad history of leaks. The company had engaged in some relatively limited reconditioning heretofore, but for the most part had handled leaks in the lines on an individual basis when they occurred. For depreciation the company accounting had placed the lines in a composite account with a useful life of twenty-five years.

The trial court found:

"The work was done to repair defects and leaks in the pipe, to remove potential defects and to maintain the reliability of the line. The segments upon which the work was done were selected because of the history of leaks in the line and the location of the line."

The trial court also found that the work done was not a part of any general plan of betterment, did not enhance the property's value, and did not adapt the property to a different use. The court also found that the portions charged to expense were not replacements but were incidental repairs which did not appreciably prolong the life of the pipe reused, but kept the segment in operating condition. The court thus concluded that the expensed costs were ordinary neces-

sary expenses paid or incurred in carrying out the company's business, and gave judgment for the taxpayer.

As indicated above, the deductions were made as necessary expenses under section 162 of the Internal Revenue Code of 1954. This section provides in part without elaboration that " * * * all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * " may be allowed as a deduction. Section 263 of the 1954 Code provides that a deduction may not be made for the expenses incurred for the acquisition of any buildings, for permanent improvements, or for "betterments made to increase the value of any property. * * * " This same section also precludes deductions for amounts spent in "restoring property or in making good the exhaustion thereof for which an allowance is or has been made." Pursuant to the Code provisions, the Treasury Regulations provide in section 1.162–4 in part: "The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in ordinarily efficient operating condition, may be deducted as an expense * * *." This same section also states:

"Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept."

The Treasury Regulations relating to capital expenditures, section 1.263(a)–1, provide that a deduction may not be allowed for betterments made to increase the value of the property nor for amounts paid to "substantially prolong the useful life" of property or equipment. This same subsection also states: "Amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures within the meaning" of the subparagraphs concerned.

As indicated in our decisions hereinafter cited, these regulations are of long standing and were early construed by the Board of Tax Appeals in the frequently cited case of Illinois Merchants Trust Co., 4 B.T.A. 103. There the Board indicated that the purpose for which the expenditures were made was an important factor and went on to state:

"A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired."

The Board contrasted expenditures made for such purposes with those improvements or additions which prolonged the life of the property.

This court, in Hotel Kingkade v. Comm'r of Internal Revenue, 180 F.2d 310 (10th Cir.), considered expenditures which had been made in connection with the operation of a hotel. These expenditures were for carpets, kitchen equipment, appliances, fans, roofing, tile work, and a variety of other expenditures. We there said that the expenditures therein made were such as to materially add to the value of the property and appreciably prolong its life as an operating hotel. It was held that such expenditures were of a capital nature. In Denver & Rio Grande Western R. R. v. Comm'r of Internal Revenue, 279 F.2d 368 (10th Cir.), the issue concerned expenditures made by the taxpayer upon an old wooden viaduct. These expenditures consisted of installing new wooden floor planks over most of the viaduct and some new stringers for the support of the viaduct and to stiffen the structure. The railroad had expensed the entire amount, and the Tax Court had found that the expense should have been capitalized. We held that the Tax Court was correct and stated that:

"The expenditure resulted in a substantial restoration, strengthening and

improvement of the viaduct. It was not for incidental repairs but for a replacement of a major portion of the viaduct which could no longer be repaired. The improvements so made had a useful life of many years."

A similar issue, together with the acquisition of additional property, was considered by this court in United States v. Akin, 248 F.2d 742 (10th Cir.).

■ The taxpayer in United States v. Wehrli, 400 F.2d 686 (10th Cir.), had made expenditures in connection with the alteration and refurbishing of an office building for a new tenant. The expenditures had been deducted as expense. We there again examined the regulations and the definitions which had been adopted by this court and also by the Fifth Circuit in Jones v. Comm'r of Internal Revenue, 242 F.2d 616 (5th Cir.), and other cases therein cited. Also we considered the issue as to whether or not the expenditures had been made, or certain elements thereof had been made in accordance with a general plan for rehabilitation, modernization, or improvement of the property. Reference was made to the "general plan" concept in 4A Mertens, Law of Federal Income Taxation, section 25.41, and to I. M. Cowell v. Comm'r, 18 B.T.A. 997, and followed in a series of cases therein cited. The doctrine is that where such a plan for rehabilitation existed and expenditures were made thereunder, and although particular portions of the work could otherwise be properly classified as expenditures, the entire expenditure made in accordance with the plan must be capitalized.

In the light of the regulations and of the cases cited, an application of the Code to the facts appearing in the record leads us to the conclusion that the costs incurred in the rehabilitation of the pipeline, as described above, constituted expenditures not in the ordinary course of business, but for the betterment of the segments of the line so treated, and also substantially prolonged the life of such segments.

The work of rehabilitation is centered about the recoating and rewrapping of the pipe. The segments selected, as above indicated, were those with a history of leaks and which had reached or passed the period initially assigned as their useful life. The record contains testimony on the purpose of the recoating and rewrapping of the pipeline which states it was done to protect the pipe as it had been when initially laid, but in a better way. The result thus was to start another life span for the reconditioned segments of the line. In order to accomplish the recoating and rewrapping, it was necessary to unearth the pipe and to remove such of the old coating and wrapping as remained thereon in order that the new coating and wrapping could be applied. In connection therewith, the antiquated couplings, expansion joints, and unused stubs and old valves were removed. Likewise sections of the pipe which had corroded to such an extent that it was not worthwhile to recoat and rewrap them were removed. One of the witnesses for the taxpayer testified, and reference was made to a section of pipe laid in 1929 or 1930 and to its estimated physical life. He indicated that it was reconditioned at that time and " * * * so therefore the physical life was approaching the end." The witness indicated that it was approaching the end by reason of the possibility of leaks and of corrosion. He thereupon stated in effect that the pipe would be able to stay in the ground over a longer period of time because of the new coating and wrapping. He was asked: "The coating will allow it—prolong the life of the pipe?", to which he answered, "It should." The following series of questions and answers ensued, the witness having stated that the pipe itself was no more durable but upon rehabilitation became more reliable, and stated:

"Q. Does it have any longer life,— a physical life?

"A. Longer life than it had before?

"Q. Yes.

"A. It was reconditioned?

"Q. Yes.

"A. Yes, it could last a heck of a long time."

The witness Coleman testified as follows:

"Q. Yes. Would it be correct to state that the purpose of this reconditioning process was to make the reconditioned pipe the structural equal of new pipe insofar as practical?

"A. I think that is a fair statement."

■ The company in its report to the Public Service Commission of Utah relative to part of the proposed reconditioning program stated that the original pipe was some thirty years old and was reaching the point where there was danger of breaks. It further reported that the reconditioned pipeline should have a life in excess of forty years, and through the installation in transmission lines of high pressure valves, such a line would be able to operate at pressures of 700 to 800 pounds in contrast to the pressure of the old lines at 400 pounds. The record makes further reference to the capability of the line to withstand a higher working pressure in a letter from the taxpayer to the Public Service Commission of Utah, dated April 9, 1963. This increased capability is in part attributed to the installation of the plug valves to replace the old gate valves, as well as the elimination of certain expansion joints and couplings. An official of the taxpayer testified that the new valves were better able to stand the higher pressure than the old valves. Upon replacement of the segments of the reconditioned line in the ground, it was pressure-tested at considerably higher pressures than had been used at any time theretofore. It is obvious that any individual length of the pipe could withstand no higher pressure than it had theretofore, but it is equally apparent that when an entire segment of the line had been reconditioned as above indicated, with the elimination of the old style couplings and joints and the installation of plug valves, the segment so rehabilitated could operate at higher pressures, and consequently be able to transport a greater volume of gas. The record thus clearly demonstrates that the reconditioning was done not to enable the pipeline to continue to operate during its initial estimated life, but was instead accomplished to enable the pipeline to begin a new period of expected life. This purpose and result of the reconditioning places the expenditures clearly within the capital improvement category. The record before us in our opinion leads to no other conclusion, and we must hold that the finding of the trial court to the contrary was clearly erroneous.

■ ■ The significance of a plan of rehabilitation or improvement is referred to in United States v. Wehrli, 400 F.2d 686 (10th Cir.). The record here contains portions of statements made to the Public Service Commission of Utah, and proposals for the expenditures to be made upon the various segments of taxpayer's pipelines. These references with maps demonstrate that the taxpayer embarked upon a program for rehabilitation of the designated portions of its pipelines. Mr. Simon, an official of the taxpayer, testified that the company began a reconditioning program in 1962, but had theretofore done some reconditioning work. The witness testified "this program" included in all some 257 miles of pipeline. A similar reference appears in correspondence with the Utah Public Service Commission. It is apparent that a general plan of rehabilitation, used in this sense, need not encompass all of the properties of the taxpayer or even all of one particular category of property. The taxpayer urges that the previous authorities relating to the "general plan" issue concerned the expenditures made upon a building or similar structures, and that these cannot be compared to its pipeline system. However, in view of the statements and maps submitted by the taxpayer to the Public Service Commission, and the references in the record, it is apparent that the taxpayer did embark upon a particular program of rehabilitation which was well defined in scope and

was of considerable significance in view of its overall operations and funds available. The record in our opinion cannot support the finding of the trial judge that there was no such plan of rehabilitation, and consequently we must hold that such finding was clearly erroneous.

 The taxpayer urges that the allocation of the expenditures between additions to capital and expenses as proposed by the government would amount to a change in its accounting "methods" contrary to section 446 of the Internal Revenue Code. This section in part provides that: "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." This has been construed to refer to "generally accepted accounting practices," Fort Howard Paper Co., 49 T.C. 275, and to direct primary consideration to whether income is clearly reflected, Cincinnati, New Orleans & T. P. Ry. v. United States, 424 F.2d 563, 91 Ct.Cl. 572. The taxpayer urges that similar allocations have been made in prior years, and were not contrary to the rules of the several regulatory agencies having jurisdiction over taxpayer. The authorities have extended section 446 to accounting practices of more narrow scope than "accounting methods"; however, a reallocation of the expenditures in question between the two or three accounts cannot under the circumstances here present be regarded as contrary to section 446 or to violate its purpose. We have previously considered the implications of the commissioner's determination that the "method" clearly reflects taxable income. See Harden v. Comm'r of Internal Revenue, 223 F.2d 418 (10th Cir.), and Jones v. Trapp, 186 F.2d 951 (10th Cir.) Consistency in treatment of particular transactions is of great importance in utility accounting, but an erroneous allocation should not be perpetuated on the basis of consistency. The accounting "methods" required by regulatory agencies do not necessarily dictate the proper income tax treatment for expenditures. Old Colony R. R. v. Comm'r of Internal Revenue, 284 U.S. 552, 52 S.Ct. 211, 76 L.Ed. 484. They do, however, demonstrate a reason why some accommodation should be made when possible.

We thus hold that the commissioner was correct in assessing the deficiencies he did as to the income tax returns of the taxpayer for each of the years ended December 31, 1962, December 31, 1963, and December 31, 1964, insofar as such deficiencies were based upon the allocation of expenses incurred by the taxpayer in reconditioning its pipelines, the subject of this action.

### The Depletion Base For Taxpayer's Sale of Condensate

 Natural gas is produced by taxpayer from leases in the Church Buttes field in Wyoming. It owns about fifty-one per cent of the reserves in the field and the Union Pacific Railroad owns the balance. No sales of raw gas are made by taxpayer at the wellhead. The two companies also own proportionally a plant near the field which separates the water and the hydrocarbon liquids from the gas produced from the field. There is no separation made at or near the wellheads; instead it is done for all the wells at the central plant. As the gas enters this plant, it passes through the inlet scrubber. This device separates the then liquid hydrocarbons, condensate, from the incoming stream. The liquids so derived are stored for a time and sold to refiners. The gas after this separation still contains hydrocarbons which are liquefiable at temperatures and pressures which may be encountered in the pipelines before the gas reaches the ultimate customer and thus should be removed to prevent accumulation in the lines. At taxpayer's plant these are removed by the absorption method which utilizes oils to absorb the liquefiable hydrocarbons in the gas. This oil with the condensate absorbed by it is then heated in a still and the two are then separated by condensation. The condensate portion is placed in storage to be sold, and the absorbing oil is reused. The gas also con-

tains some water vapor when produced, and this is also removed in the plant by a vapor absorber or contractor using diethylene glycol. The absorption methods utilized in this plant do not change chemically the condensate, and no fractionation of the condensate is attempted—that is, it is not further separated into its components. The condensate is instead placed in storage tanks and sold as such to refiners.

The United States Geological Survey which is the agency which administers the taxpayer's federal leases in the Church Buttes field requires the taxpayer to pay royalty to the government based on the values at the completion of the processing at the plant on the theory that no "manufacturing" takes place at the plant, and it is instead part of the production of the gas.

The trial court concluded that the absorption plant, and its processes, were part of the production process, and that the sale price of the condensate at the plant outlet was the depletable base for this product.

The relevant limitations of the depletion allowance are set out in United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581; Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347; Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S. Ct. 616, 82 L.Ed. 897, and Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489, and need not be repeated here. The present Treasury Regulations relative to the matter appear at section 1.613–3(a). It is sufficient to say that the income upon which the allowance may be applied is to be that derived from production, gross income from the property, and not on any manufacturing costs which may be added. The issue thus becomes whether or not the absorption process here used is a part of or essential to production or whether it is a manufacturing process. The point where production ceases and manufacturing begins was of course the issue in the Cannelton

case, and the related cases which followed including the limestone-cement cases.

We are here concerned only with the depletion base for the condensate, but again the production-manufacturing division must be made. The government here relies strongly on Shamrock Oil & Gas Corp. v. Comm'r of Internal Revenue, 346 F.2d 377 (5th Cir.), which also considered an absorption plant operated by an integrated oil company, and which adopted the decision of the Tax Court in the same case (35 T.C. 979). We also refer to the Tax Court decision. The Circuit Court thus held that the absorption process there used, and which is the same as here used, was part of the manufacturing process and not an "element of production." The court also distinguished its prior decisions in Weinert's Estate v. Comm'r of Internal Revenue, 294 F.2d 750 (5th Cir.), and in Scofield v. La Gloria Oil & Gas Co., 268 F.2d 699 (5th Cir.), where a recycling process was considered. In the case before us we reach the same conclusion as was reached in Shamrock. The absorption process here was not followed by further processing as in Shamrock, but nevertheless is not part of production nor necessary thereto. The fact that the condensate was further divided by fractionation in Shamrock was not a factor considered by the Fifth Circuit, and to us it does not distinguish the case.

The absorption process here used was apparently necessary or advantageous in the subsequent marketing of the gas by the taxpayer, or perhaps necessary before long distance movement of the gas took place, but this is not the test. Thus in the record, the reason advanced for the removal of liquids or liquefiable vapors from the gas was that their presence would interfere with the passage of the gas through the pipelines. It was testified that the hydrocarbon liquids would collect in low portions of the line and block the passage of gas. Also the witnesses stated that the water vapor in the gas would lead to the creation of compounds which would have a like effect. Thus the plant was designed to remove

these materials to enable the gas to be transported for marketing. This marketing reason required the process which because of this purpose was manufacturing as distinct from production.

The depletion base for the condensate thus must be derived from representative market prices for wet gas, and the condensate sales price at the outlet of the absorption plant cannot be used as the base.

No issue was raised or considered on this appeal relative to a credit for carryback of unused investment credit.

The case is reversed and remanded for further proceedings in accordance with this opinion.