**MONFORT OF COLORADO, INC.,**
**successor in interest to Monfort**
**Feed Lots, Inc., Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 74–M–558.**

United States District Court,
D. Colorado.

Jan. 19, 1976.

Claude M. Maer, Jr., and David G. Palmer, Holland & Hart, Denver, Colo., for plaintiff.

John B. Owens, Trial Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

MATSCH, District Judge.

This is a federal income tax refund case in which the only issue is whether the accounting method used by plaintiff's predecessor, Monfort Feed Lots, Inc., accurately reflects its taxable income for the fiscal year ended August 31, 1968. The core of the controversy is the computation of cost of sales. For convenience, the taxpayer and plaintiff are referred to herein as Monfort.

The business of Monfort is the production of cattle for the livestock markets. It buys cattle from breeders and fattens them in feedlots. Its operations are conducted on a large scale and require very substantial inventories of cattle and cat-

tle feed. The prices of calves, fat cattle, corn and other kinds of feed are subject to large fluctuation. These price changes are the basis for the commodity futures market. A futures contract is an agreement to buy or sell a certain quantity of a commodity at a future date for a fixed price. The buyers and sellers in such contracts are brought together by brokers operating through an exchange. A cattle contract is an agreement to buy or sell 40,000 pounds and such contracts call for various delivery dates designated by months. Futures contracts are closed or settled either by delivery of the commodity or by an offsetting transaction made at any time before delivery date. Thus, a seller obligated to make delivery may cancel his position by purchasing a contract to buy the same commodity. The value difference between the two contracts measures gain or loss on the transactions. Commodities brokers are paid commissions on these transactions and they conduct business through margin accounts. Commodities transactions and exchanges are subject to substantial governmental regulations.

Producers, dealers and processors of agricultural commodities make use of the futures markets to protect themselves against the impact of price changes. This process is called "hedging." This process also benefits consumers by providing greater price stability than would otherwise occur. These markets also attract speculators. Governmental regulations and exchange rules differ for hedgers and speculators.

Monfort has used hedging to protect its inventory position in cattle and cattle feed. Thus, it has sold short to protect against falling prices for its inventories on hand and it has bought long to protect against rising prices for its foreseeable future purchasing requirements. The use of hedging involves the exercise of very sophisticated judgment and these commodities futures contracts are a top level management responsibility at Monfort. Monfort has never been a speculator in the commodities markets.

Since 1951, Monfort has consistently used the LIFO method of determining the costs of its sales and the value of its inventories. Under that well established accounting method for determining the results of a year's business, it is assumed that sales are made from the most recently purchased raw materials. LIFO refers to the phrase "last in first out." During an inflationary period with continuing cost increases, the LIFO method is very valuable because it permits cost of sales and resultant gross profits to be measured upon current costs of raw materials rather than the lower earlier costs.

LIFO is easy to apply when there is no difference between beginning and ending inventories. There, the cost of sales for the year is simply the total of purchases for that year. Where there is an increase in the ending inventory, computation of cost of sales by LIFO requires the application of a corollary called the "first purchase acquisition layer" method. That involves the assumption that the increase in inventory represents the earliest purchases made in the accounting year. By way of example, if the aggregate amount of the increase in the ending inventory over the beginning inventory is 15 units, the value of that ending inventory is computed by adding the cost of the first 15 units purchased in the year to the cost of the beginning inventory.

For the fiscal year ending August 31, 1968, Monfort had an inventory increase of more than 9,600,000 pounds in cattle. Using the first purchase acquisition method, this increase represented cattle purchased from September 1, 1967 to October 6, 1967.

Monfort also had hedging gains in fiscal 1968. For those cattle contracts open or opened during the first purchase acquisition period, September 1, 1967 to October 6, 1967 and thereafter closed, the amount of net gain was $32,738.00. In computing taxable income for fiscal 1968, Monfort deducted that amount of hedging gain from its ending inventory. The theory of that computation is that

the net hedging gain for the period of the first purchase acquisition layer had the effect of reducing the cost of acquisition of that layer. Hedging gains subtracted from total cost of the first acquisition yields a net acquisition cost and that net figure is the value of the increase in inventory. The value of the ending inventory is thus reduced by the amount of the hedging gains attributable to the first period acquisition layer. This results in an increase in cost of sales with a corresponding decrease in gross profits to the extent of those hedging gains. That, in turn, reduced taxable income by $16,762.00. That amount was assessed and collected from Monfort and it is the basis for this refund suit. My conclusion is that this assessment was erroneous, illegal and improper.

The Internal Revenue Code at 26 U.S.C. § 446 provides that taxable income is to be computed under the method of accounting regularly used by the taxpayer in keeping his books and it is unquestioned that LIFO is an acceptable accounting method. Treasury Regulations, at 26 C.F.R. § 1.471–2, recognize that inventory rules cannot be uniform because they must reflect and give effect to trade customs within the scope of accounting practices in the particular trade or business. The essence of the dispute in this case is that the Commissioner refuses to recognize that hedging is an integral part of the business of acquiring and feeding cattle for sale. This resistance seems to reflect a concern that this is a technique for deferring the taxation of trading gains. That concern appears to be almost phobic. It is not founded in fact.

There is an element of risk in hedging transactions as there is risk in all business activity. While hedging gains will result in reducing the cost of the acquisition of cattle, hedging losses will increase that cost. Likewise, if inventory is reduced in a subsequent year there will be a recapture of a corresponding portion of this tax avoidance.

The treatment given to the results of hedging transactions with respect to the 1968 taxable income is logical and represents an application of generally accepted accounting principles. The purpose of any accounting method is to reflect accurately the results of any given period of economic activity. Accepting hedging as an appropriate management technique for minimizing the impact of price fluctuations, it is clear that any gain or loss from hedging is a reflection of the actual cost of acquiring cattle by Monfort. The adoption of the Commissioner's contention that the net gain or loss from these commodity futures transactions must be reflected as other business income or losses or that they must be used as gross adjustments to the cost of sales by adding losses and subtracting gains requires the adoption of an artificial assumption that Monfort's activities should be considered separately. In short, the Commissioner assumed Monfort was a speculator in the commodities market.

The Commissioner also contends that even if the accounting treatment given to these hedging gains was proper, it would constitute a change from the previous method of accounting not authorized by the Commissioner. That consent is required both by statute and regulation when the change in method is material and significant. The only inconsistency revealed in this record is that in 1965 Monfort reported a hedging gain of $11,714.00 in corn hedging transactions as an item of other income. This fact must be viewed in context. In 1965 the total of payments for corn by Monfort was $5,529,971.00. Obviously, the corn hedging gain was a very small part of the activity in corn acquisitions. Additionally, it seems clear that the kind of change in accounting method requiring the Commissioner's prior consent is a change in the basic method of reporting and not in the treatment of specific items. *Oklahoma Gas & Electric Company v. U. S.*, 464 F.2d 1188 (10th Cir. 1972); *Mountain Fuel Supply Co. v. U. S.*, 449 F.2d 816 (10th Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972); *Beacon Publishing Co. v. C. I. R.*, 218 F.2d 697 (10th Cir.

1955). The purpose of requiring the Commissioner's advance consent for change is the prevention of tax avoidance through the manipulation of accounting techniques. No such purpose is perceived in this record. The volume of corn hedging transactions in 1965 was minor in comparison with the totality of Monfort's business activity. Hedging transactions in cattle futures did not become an important part of Monfort's business until after 1965 when a viable cattle futures market first became available.

In summary, it is my view that the taxpayer's method of using the hedging gain made from cattle futures contracts open during the period of the first purchase acquisition layer to reduce the value of its ending inventory and to increase its cost of sales for the period is an acceptable accounting method which accurately reflects Monfort's business operations during that fiscal year. Therefore, it is an accurate method of measuring taxable income in that year. It is, therefore

Ordered that the plaintiff shall have judgment against the defendant for the recovery of the income taxes erroneously, illegally and improperly assessed and collected from it for the fiscal year ended August, 1968 and the parties shall submit an agreed computation of the amount of that judgment within twenty days.