**MONFORT OF COLORADO, INC.,
successor in interest to Monfort
Feed Lots, Inc., Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 76–1388.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 19, 1977.

Decided Aug. 8, 1977.

Arthur L. Bailey, Tax Div., U. S. Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews and Ann B. Durney, Tax Div., U. S. Dept. of Justice, Washington, D. C., on the brief), James L. Treece, U. S. Atty., Denver, Colo., of counsel, for appellant.

Claude M. Maer, Jr., Denver, Colo. (David G. Palmer and Paul T. Ruttum, Denver, Colo., on the brief), of Holland & Hart, Denver, Colo., for appellee.

Before SETH, McWILLIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

The United States of America (IRS) appeals from an adverse judgment after trial to the court in a tax refund suit initiated by appellee, Monfort of Colorado, Inc. (Monfort), as successor in interest to Monfort Feed Lots, Inc. The relevant facts are not in dispute.

Monfort is a large cattle finisher. It buys cattle from breeders and then fattens them in feedlots. Since 1951 it has consistently utilized the LIFO (last in first out) method of establishing its inventories and costs of sales for income tax purposes.

LIFO is a generally accepted and approved accounting procedure under which it is assumed that sales are always being generated by the most recently acquired raw materials. It is also assumed that increases in ending inventory within a LIFO system are represented by the earliest purchases made during the accounting year. This corollary is commonly referred to as the "first purchase acquisition layer."

In its operation Monfort buys tremendous quantities of grain and other feeds which are subject to substantial price changes. For a number of years, in an effort to afford some price stability to its feed acquisitions, Monfort has participated as a "hedger" in the grain futures market. Within a commodity market, such as corn, buyers such as Monfort contract to buy or sell a certain quantity of grain on a specific date at an established price. As a "hedger" Monfort does not participate in commodities markets for purposes of investment or speculation. Monfort enters into commodity transactions for purposes of inventory cost protection. In so doing, Monfort has bought "long" during periods of rising prices and has sold "short" during periods of declining prices. This practice has afforded a degree of cost certainty to its feed costs.

In 1965 a similar commodity market developed for live cattle. By 1967 and 1968 Monfort had become very active as a "hedger" buying and selling in the live cattle futures market. Just as with grain futures, Monfort participated in the cattle futures market exclusively as a "hedger" in an effort to afford itself a means and degree of inventory cost protection.

In the early 1960's Monfort reported its futures market gains and losses as separate income items or as direct adjustments to its costs of goods sold. In 1967, however, Monfort began utilizing futures market gains/losses as adjustments to its ending inventory. Under this procedure, futures market gains which were open or opened during the "first purchase acquisition layer" period would be deducted from the ending inventory. This, in turn, would result in a higher cost of goods sold and thus decrease the tax due. Conversely, futures market losses are added to the ending inventory, resulting in a lower cost of goods sold and increasing the tax due.

Having adopted this procedure, Monfort did not treat its 1968 cattle futures gain of $32,738.00 as an individual item of income; rather, it reduced its ending cattle inventory by a like amount in filing its 1968 return. Upon reviewing Monfort's 1968 return, IRS determined that such treatment of hedging gains did not clearly reflect income and that it also constituted a change in accounting methods without prior approval. IRS then assessed Monfort additional taxes allegedly due. Monfort paid the tax and sued for a refund.

Monfort developed its case below through the testimony of four witnesses: [1]

Dennis Swenson, a C.P.A., and a partner with Ernst and Ernst, who had been associated with Monfort's account since 1962, testified that he was involved with the auditing of Monfort's computation of its inventory in 1968; that hedging is a means of inventory costs protection; that hedging would be "a means of entering into a commodity transaction to protect the cost of the inventory in relation to the price fluctuations and what that inventory might be sold at to keep an advantage (sic) relationship between the two"; that in 1968 Monfort deducted cattle hedging gains from first purchase acquisitions; that although he didn't know why, an $11,714 corn futures hedging gain for 1965 was included under "other income"; and that the first acquisition layer method is permitted under IRS regulations.

Kenneth Monfort, co-chairman and past president of Monfort, testified that Monfort started hedging in live cattle during 1965 or 1966 prior to which there was no viable market; since the 1960's he has done all the

---

1. We deem it noteworthy that whereas Monfort developed its case through the testimony of four witnesses, [R., Vol. I, pp. 5–114.] appellant presented only one witness. [R., Vol. I, pp. 117–140.]

hedging or it was done under his supervision for Monfort; that cattle trading is done, according to statistical information available, by "about half speculators and half hedgers"; that Monfort participates only as a hedger and has never participated as an investor or speculator; that he would be fired if he ever participated in cattle futures as an investor or speculator; that Monfort hedges "[T]o protect the costs we have in our inventory or the costs that we anticipate bringing into our inventory in the future months"; that Monfort is classified with the commodity exchange authority as a hedger and it is required to make daily reports to it; and that the exchange limits the degree to which Monfort can hedge.

Kenneth Lloyd testified that he is a broker and vice-president of a securities firm; that he specialized in commodity futures; that Monfort is listed as a hedger and has never been considered a speculator; and that whereas Monfort has delivered and has accepted delivery of cattle as a result of its participation in cattle futures, it does so only to a "very small extent."

Jerome Kesselman, professor, testified as an expert witness. Kesselman stated that he knew of "no material anywhere that might serve as a guideline when we bring the two together into a single activity, namely, LIFO layers coupled with a hedging practice"; hedging is designed to "measure and crystallize" the cost of inventory in place; the hedging process is associated with the desire to determine in advance as close as possible the cost of a unit of raw material; hedging gains should be treated like a trade discount as a decrease in cost; that when compared to the Government's position on hedging gains, that Monfort's treatment of hedging gains/losses is an acceptable accounting practice which clearly reflects income; Monfort's treatment of hedging gains is the more appropriate method for inventory valuation, in terms of costs of goods sold and resulting net profit; and that Monfort's treatment of hedging gains gives "a more reflection of income." On cross-examination, Kesselman said that hedging does not defer income because "the gain or loss from hedging is a protective device to insure your cost and your margin and open inventory is not an income"; and that gain or loss from hedging is an element of cost.

IRS presented its evidence through the testimony of one witness, Irwin Leib, a tax law specialist. Leib testified that the interplay of the hedging gain and the reductions of basis in ending inventory used by Monfort is totally wrong; that Monfort's approach is an extremely sophisticated approach to an involved complex transaction resulting in the permanent deferral of the hedging gain; that hedging transactions should be treated separately from inventory valuations; and that there are no references in the regulations which allow for this type of reduction in inventory basis. On cross-examination, Leib did acknowledge that the main issue was whether you "integrate or isolate" hedging gains and that to his knowledge, there was nothing in the regulations which prohibited the manner in which Monfort handled its hedging gains.

In rendering judgment for Monfort the trial court found, *inter alia*:

The Internal Revenue Code at 26 U.S.C. § 446 provides that taxable income is to be computed under the method of accounting regularly used by the taxpayer in keeping his books and it is unquestioned that LIFO is an acceptable accounting method. Treasury regulations, at 26 C.F.R. § 1.471–2, recognize that inventory rules cannot be uniform because they must reflect and give effect to trade customs within the scope of accounting practices in the particular trade or business. The essence of the dispute in this case is that the Commissioner refuses to recognize that hedging is an integral part of the business of acquiring and feeding cattle for sale. This resistance seems to reflect a concern that this is a technique for deferring the taxation of trading gains. . . .

[R., Vol. III, pp. 22–23.]

\*     \*     \*     \*     \*     \*

The treatment given to the results of hedging transactions with respect to the 1968 taxable income is logical and represents an application of generally accepted accounting principles. *The purpose of any accounting method is to reflect accurately the results of any given period of economic activity.* Accepting hedging as an appropriate management technique for minimizing the impact of price fluctuations, it is clear that any gain or loss from hedging *is a reflection of the actual cost of acquiring cattle by Monfort.* The adoption of the Commissioner's contention that the net gain or loss from these commodity futures transactions must be reflected as other business income or losses or that they must be used as gross adjustments to the cost of sales by adding losses and subtracting gains requires the adoption of an artificial assumption that *Monfort's activities should be considered separately. In short, the Commissioner assumed Monfort was a speculator in the commodities market.* (Emphasis supplied.)
[R., Vol. III, p. 23.]

\* \* \* \* \* \*

*In summary, it is my view that the taxpayer's method of using the hedging gain made from cattle futures contracts open during the period of the first purchase acquisition layer to reduce the value of its ending inventory and to increase its cost of sales for the period is an acceptable accounting method which accurately reflects Monfort's business operations during that fiscal year. Therefore, it is an accurate method of measuring taxable income in that year.* . . .
(Emphasis supplied.)
[R., Vol. III, pp. 24–25.]

On appeal IRS contends that the trial court erred in (1) ruling that Monfort did not have to consider hedging gains and losses separately but could utilize them to adjust its ending inventories, and (2) in concluding that Monfort could change its method of inventory valuations without initially seeking and obtaining the consent of the Commissioner of Internal Revenue in accordance with Section 446(e) of the Internal Revenue Code.

## I.

IRS contends that the trial court erred in ruling that Monfort was not required to consider hedging gains and losses separately but could utilize them to adjust its ending inventories. IRS argues that hedging gains cannot be utilized to reduce the cost of Monfort's inventories, that hedging gains must be reported as ordinary income, and that Monfort's treatment of hedging gains "distorts income" by both omitting and improperly deferring income. Although not presented to or argued to the trial court below, IRS, on appeal, relies upon *Corn Products Co. v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955) in support of its contention that gains derived from dealing in commodity futures are taxable as ordinary income.

In *Corn Products, supra*, taxpayer denied that it was a "hedger." It contended that its futures activities were separate and apart from its manufacturing operation, and that it was dealing in the market as a "legitimate capitalist," and, as such, was entitled to capital gains or losses on its futures investment. In affirming judgment for the IRS the Court observed:

. . . It matters not whether the label be that of "legitimate capitalist" or "speculator"; this is not the talk of the capital investor but of the farsighted manufacturer. . . .
350 U.S., at p. 51, 76 S.Ct., at p. 23.

\* \* \* \* \* \*

. . . Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss . . .

\* \* \* \* \* \*

. . . It held that hedging transactions were essentially to be regarded as insurance rather than a dealing in capital assets and that gains and losses therefrom were ordinary business gains and losses. . . .
350 U.S., at pp. 52–53, 76 S.Ct., at p. 24.

Under *Corn Products, supra*, participation in futures gives rise to ordinary income and ordinary deductions rather than capital gains or losses. This holding is based on the predicate that Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss. In *Corn Products, supra*, as in the instant case, the impetus for participating in futures is to achieve a "form of insurance against increases in the price" of raw materials, and in each case the trial courts found that participation was an integral part of the taxpayer's overall operation.

*Corn Products, supra*, however, does not reach or answer the question presented herein, i. e., whether hedging gains and losses may be utilized to effectuate adjustments to ending inventory. The trial court correctly observed that this is a case of first impression. Accordingly, while we must look to *Corn Products, supra*, for guidance, it cannot be considered controlling. This is especially true, when, as here, the IRS expert acknowledged that there was nothing in the regulations which prohibited the manner in which Monfort accounted for its hedging gains, and when recent tax court opinions have allowed for capital gains treatment of income generated by corn and cattle futures of a cattle feeder. *See:* Thomas Meade, Jr., T.C.Memo 1973–46. Given this background, we will review the evidence in the record to determine if the trial court, based upon the facts of this case, was clearly erroneous in its order authorizing Monfort to utilize hedging transactions to adjust its ending inventories.

Monfort established beyond all reasonable doubt that in its particular operation hedging participation is an integral part of its overall operation relating directly and exclusively to cost control. Dennis Swenson, an accountant who audited Monfort's computation of inventory, testified that hedging was a means of inventory costs protection. Kenneth Monfort stated that Monfort hedged to protect the costs it had in its inventory and the costs it anticipated bringing into inventory. Kenneth Lloyd said that Monfort had participated solely as a hedger, and that although Monfort had delivered and accepted delivery of cattle as a result of its cattle futures participation, it did so only to a "very small extent."[2] Jerome Kesselman stated that the hedging process was designed to crystallize and measure the cost of inventory in place, and that in terms of costs of goods sold and the resulting net profit, Monfort's treatment of hedging gains was preferred over the IRS proposal, because Monfort's procedure gave "a more reflection of income." Kesselman also stated hedging gains should be treated like a trade discount as a decrease in cost.

That hedging has its genesis as a cost factor is generally accepted:

A hedge is regarded as a form of business insurance, *directed to the factor of price of a commodity used in a business, and in its consequences is treated as an expenditure in the course of the business.* Gain realized therefrom is treated as ordinary income, and loss is treated as business expense.[3] (Emphasis supplied.)
[Mertens, Vol. IIIB § 22.14, p. 106.]

▮ In view of the substantial uncontradicted evidence presented by Monfort

---

**2.** Monfort's practice in this regard is completely opposite from that of the taxpayer in *Corn Products, supra*, where the court found:

. . . With a storage capacity of only 2,300,000 bushels of corn, a bare three weeks' supply, Corn Products found itself unable to buy at a price which would permit its refined corn sugar, cerelose, to compete successfully with cane and beet sugar. To avoid a recurrence of this situation, *petitioner, in 1937, began to establish a long position in corn futures "as a part of its corn buying program" and "as the most economical method of obtaining an adequate supply of*

*raw corn" without entailing the expenditure of large sums for additional storage facilities.* At harvest time each year it would buy futures when the price appeared favorable. It would take delivery on such contracts as it found necessary to its manufacturing operations and sell the remainder in early summer if no shortage was imminent. . . . (Emphasis supplied.)
350 U.S., at p. 48, 76 S.Ct., at p. 22.

**3.** This last sentence is footnoted to *Corn Products, supra*, which we have heretofore discussed in detail and distinguished.

that hedging is utilized almost exclusively for cost control in its operation, we hold that the trial court's finding that hedging, in the Monfort operation, is a reflection of the actual cost of acquiring cattle, is not clearly erroneous. Fed.Rules Civ.Proc. rule 52(a); *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Joyce v. Davis,* 539 F.2d 1262 (10th Cir. 1976); *Hartzell v. United States,* 539 F.2d 65 (10th Cir. 1976); *Aherns v. Veterans Administration,* 537 F.2d 1098 (10th Cir. 1976). Findings of a trial court, even those involving evaluation of expert testimony, cannot be disturbed on appeal unless found to be clearly erroneous. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672 (1949).

The trial court's finding that hedging is a reflection of Monfort's costs of acquisition is in keeping with the regulatory mandates that valuations of inventories must necessarily be flexible in order to give effect to trade customs:

> (b) It follows, therefore, *that inventory rules cannot be uniform but must give effect to trade customs which come within the scope of the best accounting procedure in the particular trade or business.* In order to clearly reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation as long as the method or basis used is in accord with §§ 1.471–1 through 1.471–11. (Emphasis supplied.)
>
> [26 C.F.R. § 1.471–2(b)]

We deem it significant to note that the IRS expert acknowledged that there was nothing in the regulations, to the best of his knowledge, which prohibited Monfort's tax treatment of hedging gains/losses. Under the circumstances, we will not hold that there is but one way and one way only for Monfort to value its ending inventories. In *Van Pickerill & Sons, Incorporated v. United States,* 445 F.2d 918 (7th Cir. 1971), the Court observed:

Section 471 provides that the accounting method prescribed should conform as nearly as possible to the best accounting practice in the trade or business and more clearly reflect income. Both the taxpayer and the government introduced the opinions of noted experts on the question of the "best accounting practice" leading the district court to conclude that "no uniform method of accounting can be prescribed for all taxpayers." The government argues that this conclusion is erroneous since use of the superlative "best" in Section 471 allows but one acceptable accounting method. We do not believe, however, Congress intended the federal judiciary to decide, as a matter of law, accounting disputes where there is a wide diversity of expert opinion. Congress has so indicated by using the phrase "conforming as nearly as may be * * *" in Section 471. . . .

> \* \* \* \* \* \*

. . . *We agree with taxpayer that no one accounting principle or case supports the government position since there is no one, single definition of costs.* (Emphasis supplied.)

445 F.2d, at pp. 920–921.

*See also Colorado Springs National Bank v. United States,* 505 F.2d 1185 (10th Cir. 1974) and *Mountain Fuel Supply Company v. United States,* 449 F.2d 816 (10th Cir. 1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972), for our holding that compulsory accounting rules of a regulatory agency do not control tax consequences.

■ Applying the applicable facts to the *limited* issue here considered, we hold that the trial court did not err in upholding the manner in which Monfort "costed" its hedging activities against its ending inventories.

## II.

IRS contends, in the alternative, that the trial court erred in concluding that Monfort could change its method of inventory valuations without initially seeking and obtaining the consent of the Commissioner in ac-

cordance with 26 U.S.C.A. § 446(e) of the Internal Revenue Code, which provides:

> Except as otherwise expressly provided in this chapter, *a taxpayer who changes the method of accounting on the basis of which he regularly computes his income* in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate. (Emphasis supplied.)

26 C.F.R. § 1.446–1(e)(2)(ii)(a) defines a change in the "method of accounting" as:

> .  .  .  A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. Although a method of accounting may exist under this definition without the necessity of a pattern of consistent treatment of an item, in most instances a method of accounting is not established for an item without such consistent treatment. A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction. Changes in method of accounting include a change from the cash receipts and disbursement method to an accrual method, or vice versa, a change involving the method or basis used in the valuation of inventories.
>
> .  .  .

Monfort argues that it did not change its method of accounting, and that, in any event, it had not *"regularly* computed his income" from hedging gains in cattle prior to the 1967–1968 period in issue, because prior to that time there was not a viable market. Under such circumstances, Monfort contends that it did not change the *method* in which it *regularly computes income.*

In finding favorably for Monfort on this issue, the trial court said:

> .  .  .  The only inconsistency revealed in this record is that in 1965 Monfort reported a hedging gain of $11,714.00 in corn hedging transactions as an item of other income. This fact must be viewed

in context. In 1965 the total of payments for corn by Monfort was $5,529,971.00. Obviously, the corn hedging gain was a very small part of the activity in corn acquisitions. Additionally, it seems clear that the kind of change in accounting method requiring the Commissioner's prior consent is a change in the basic method of reporting and not in the treatment of specific items. *Oklahoma Gas & Electric Company v. U. S.,* 464 F.2d 1188 (10th Cir. 1972); *Mountain Fuel Supply Co. v. U. S.,* 449 F.2d 816 (10th Cir. 1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972); *Beacon Publishing Co. v. C. I. R.,* 218 F.2d 697 (10th Cir. 1955). The purpose of requiring the Commissioner's advance consent for change is the prevention of tax avoidance through the manipulation of accounting techniques. No such purpose is perceived in this record. The volume of corn hedging transactions in 1965 was minor in comparison with the totality of Monfort's business activity. Hedging transactions in cattle futures did not become an important part of Monfort's business until after 1965 when a viable cattle futures market first became available.

■ We hold that the trial court properly found that Monfort did not change the method in which it regularly computed its income.

■ In *Beacon Publishing Company v. Commissioner of Internal Revenue,* 218 F.2d 697 (10th Cir. 1955), cited by the trial court, we held:

> The Commissioner urges that since the taxpayer had for years prior to 1943 and 1944 carried these accounts on its books as cash items, it cannot change its system of accounting without the consent of the Commissioner. Treasury Regulations 111, Sec. 29.41–2. The Commissioner is vested with wide discretion in determining whether a change in a taxpayer's method of accounting shall be allowed. *Brown v. Helvering,* 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725; *Aluminum Castings Co. v. Routzahn,* 282 U.S. 92, 51 S.Ct. 11, 75 L.Ed. 234, supra; *United States v.*

*Anderson,* 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347, supra; *United States v. American Can Co.,* 280 U.S. 412, 50 S.Ct. 177, 74 L.Ed. 518; *Niles Bement Pond Co. v. United States,* 281 U.S. 357, 50 S.Ct. 251, 74 L.Ed. 901, supra. *The taxpayer, however, did not seek to change its accounting system. It did no more than apply the method adopted and in use to clearly reflect its income.* This the taxpayer had the right to do and the Commissioner had the right to require it. *United States v. American Can Co.,* supra. . . . (Emphasis supplied.)

218 F.2d, at pp. 701–702.

It is uncontested that Monfort regularly and consistently utilized the LIFO method inventory valuation, even after it became an active participant in the live cattle futures market. Given this background, we are not inclined to hold that the hedging gains/losses adjustments to ending inventory implemented during the 1967–1968 tax accounting period gave rise to a change in Monfort's method of accounting with which it regularly computed its income. There was an abundance of evidence from which the trial court could conclude, as it did, that Monfort's practice of adjusting inventories via hedging participation is "an acceptable accounting method which accurately reflects Monfort's business operations during that fiscal year." To be sure, the IRS may require that a taxpayer change its accounting methods, if the methods employed do not clearly reflect income. *Adolph Coors Company v. C. I. R.,* 519 F.2d 1280 (10th Cir. 1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). However, methods which clearly reflect income need not be changed upon demand.

WE AFFIRM.