**LAKE SUPERIOR DISTRICT POWER COMPANY, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 81-2702.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 16, 1982.

Decided March 4, 1983.

Paul V. Harris, Glendale Heights, Ill., Sharon L. King, Isham, Lincoln & Beale, Chicago, Ill., for petitioner-appellant.

Richard Farber, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before ESCHBACH and COFFEY, Circuit Judges, and DUMBAULD,* Senior District Judge.

ESCHBACH, Circuit Judge.

Lake Superior District Power Company ("Lake Superior") brought this action in the Tax Court to set aside the Commissioner's determination that Lake Superior underpaid its income taxes in 1975 and 1976. Lake Superior argued that its sale of a stretch of transmission power lines in 1975 had no tax effect that year; therefore no gain on the sale needed to be recognized in 1975. Lake Superior also contended that certain fees collected from customers in 1976 were contributions in aid of construction and thus excludable from gross income. The Tax Court disagreed with Lake Superior on both points and entered judgment for the Commissioner. Noting jurisdiction under 26 U.S.C. § 7482, we affirm.

---

* The Honorable Edward Dumbauld, Senior District Judge for the Western District of Pennsylvania, sitting by designation.

## I. BACKGROUND

Lake Superior is a regulated public utility engaged in the generation, transmission, distribution, and sale of electrical energy throughout parts of Wisconsin and Michigan. In 1973 Lake Superior completed construction on and put into operation a new 161,000 volt transmission line that stretches for 55 miles between Stone Lake and Minong in Wisconsin. This transmission line connects Lake Superior with other regional power companies.

By 1975, for reasons apparently unrelated to the construction of this line, it had become unprofitable for Lake Superior to provide power to two of its wholesale customers—Bayfield Electric Cooperative and Price Electric Cooperative. Early in 1975, therefore, Lake Superior reached an agreement with Dairyland Power Cooperative whereby Dairyland, not Lake Superior, would sell power to these wholesalers. Because the wholesalers are connected to Lake Superior's transmission lines, however, Dairyland had to rent the use of Lake Superior's lines. Using another power company's transmission lines is known in the industry as "wheeling" and the rental fee is a "wheeling charge."

As negotiations continued with respect to Dairyland's wheeling of power to the two wholesalers, it occurred to Lake Superior's managers that their company would be more profitable if it did not have the costs associated with owning the 55-mile stretch of transmission lines built in 1973. Dairyland and the two wholesalers agreed to purchase these lines if Lake Superior would share its financial savings by reducing the amount that it charged Dairyland to wheel power to the wholesalers. On September 10, 1975 the parties entered into a "Wheeling and Sale" agreement. By the terms of this contract, Lake Superior agreed to sell the 55 miles of transmission lines to Dairyland and the wholesalers for $2,407,000 and to pass along a portion of the financial savings in the form of lower wheeling charges.

Pursuant to an audit, the Commissioner determined that Lake Superior did not recognize a gain on its 1975 tax return for the sale of the transmission lines. Believing that a gain should have been recognized, the Commissioner assessed a deficiency. The Commissioner also determined that certain fees collected from customers in 1976 and termed "Underground Service Extension Charges," "Primary and Overhead Extension Charges," and "Transformer Charges" were improperly excluded from Lake Superior's gross income that year; thus a deficiency was entered for 1976 also.

## II. THE SALE OF THE TRANSMISSION LINES

Section 167(a) of the Internal Revenue Code of 1954 permits a taxpayer to deduct "a reasonable allowance for the exhaustion, wear and tear" on eligible business or income-producing property. In 1971 Congress enacted § 167(m), which allows a taxpayer to determine an annual depreciation allowance under the system known as "Class Life Asset-Depreciation" ("CLARD"). See Pub.L. No. 92–178, § 109, 85 Stat. 497, 508–09. Congress delegated to the Secretary of the Treasury the responsibility to promulgate specific regulations governing the CLARD system.[1]

Under the CLARD system, for each taxable year the taxpayer creates a vintage account. See Treas.Reg. § 1.167(a)–11(b)(3). Into the account the taxpayer places all depreciable assets put into service during the year that fall within a single asset guideline class established by the Commissioner. See id. For each taxable year the taxpayer may have many vintage accounts, each containing a different class of depreciable property. A vintage account is then given a specified number of years to be used in determining the annual depreciation deduction.[2] Taking this number into

---

**1.** In the Economic Recovery Tax Act of 1981, Congress repealed 26 U.S.C. § 167(m) for property placed in service after December 31, 1980. See Pub.L. No. 97–34, § 203(b).

**2.** Under § 167(m)(1), the period of years that is selected may vary from the class life prescribed in the Treasury regulations by 20 percent.

consideration, the taxpayer applies a method of depreciation (such as "straight-line") to the unadjusted basis of a vintage account to determine the annual deduction allowed. *See* Treas.Reg. § 1.167(a)–11(c). The projected salvage value of assets in a vintage account does not affect the annual depreciation deduction. Rather the salvage value is placed in a depreciation reserve account along with the depreciation deductions as they are taken. *See* Treas.Reg. § 1.167(a)–11(c)(1)(ii). When the depreciation reserve account equals the unadjusted basis of the vintage account, depreciation deductions must cease.

Lake Superior adopted the CLARD system for depreciable property placed into service in 1973. Therefore the 55-mile stretch of transmission lines built that year was placed in an appropriate vintage account. Indeed, this asset constituted nearly one-half of its vintage account's unadjusted basis. The parties would have no dispute if Lake Superior continued to own these lines. However, when a taxpayer sells (i.e. retires) an asset in a vintage account, the tax consequences depend on whether the retirement is "ordinary" or "extraordinary." The proper classification of Lake Superior's sale of the transmission lines in 1975 is the subject of this case.

Lake Superior contends that the sale should be classified as an ordinary retirement.[3] Under the CLARD system, a taxpayer does not recognize a gain or a loss on an ordinary retirement. *See* Treas.Reg. § 1.167(a)–11(d)(3)(iii). Any proceeds from the retirement are merely added to the depreciation reserve account established for the asset's vintage account.[4] Lake Superior argues that because its sale of the transmission lines constituted an *ordinary* retirement, it correctly recognized no gain on the sale in 1975.

The Commissioner, on the other hand, maintains that Lake Superior's retirement of the 55 miles of power lines in 1975 was *extraordinary.* Taxpayers using the CLARD system must recognize a gain or a loss on an extraordinary retirement in the year in which the retirement occurs. *See* Treas.Reg. § 1.167(a)–11(d)(3)(iv). Moreover, the retired asset must be removed from the vintage account and the annual depreciation deduction for the account must be reduced accordingly.

The Treasury regulations define "ordinary" and "extraordinary" retirements. A retirement of an asset from a vintage account is extraordinary if the asset is:

retired (other than by transfer to supplies or scrap) in a taxable year as the direct result of a cessation, termination, curtailment, or disposition of a business, manufacturing or income producing process, operation, facility or unit, and the unadjusted basis ... of all such assets so retired in such taxable year from such account ... exceeds 20 percent of the unadjusted basis of such account immediately prior to such event.

*See* Treas.Reg. § 1.167(a)–11(d)(3)(ii). All other retirements from a vintage account are "ordinary retirements." *Id.*

Lake Superior concedes that the transmission lines sold to Dairyland constituted more than 20 percent of the unadjusted basis of the appropriate vintage account. If we remove from the definition of "extraordinary retirement" this requirement and other terms not relevant to this case, we find that an asset's retirement is extraordinary if it is "retired ... in a taxable year as the direct result of a ... disposition of a ... income producing ... facility or unit." The 55-mile stretch of transmission lines certainly was an income producing facility or unit and the sale of this property constituted a "disposition" of the asset. The retirement, therefore, was extraordinary and Lake Superior should have recognized a gain in the year that the lines were sold.

---

**3.** Lake Superior concedes that the sale of the transmission lines constituted a "retirement" as defined in the regulations, *see* Treas.Reg. § 1.167(a)–11(d)(3)(i).

**4.** The retired asset remains in the vintage account and thus the annual depreciation deduction for the account is unaffected.

We find no significance to the fact that under the terms of the contract with Dairyland, Lake Superior is entitled to use the 55-mile stretch of power lines to the same extent as though Lake Superior continued to own those lines. The sale of an asset to effect financial savings is a disposition even if, for some reason, the seller continues to use and enjoy the asset. The few examples of extraordinary retirement in the regulations naturally involve sales where the seller stops using the sold asset; most sales take that form. However, a sale does not cease to be a disposition nor does an extraordinary retirement become ordinary simply because the seller retains rights in the asset sold.

The Commissioner's treatment of the retirement of the transmission lines as extraordinary is consistent with the general operation of the CLARD system and with the little evidence of congressional intent that there is. In considering amendments to the CLARD system in the Revenue Act of 1978, the Senate Report defined "ordinary retirements" as "retirements occurring for routine causes during the range of years selected for the account." S.Rep. No. 1263, 95th Cong., 170, *reprinted in* 1978 *U.S.Code Cong. & Ad.News* 6761, 6933; *accord* Sen. Rep. No. 144, 97th Cong., 40, *reprinted in* 1981 *U.S.Code Cong. & Ad.News* 105, 146 (retirements are ordinary if made for routine causes). Lake Superior, however, is not in the business of routinely building and then selling transmission lines. The transmission lines built in 1973 were placed into an account which had a total projected salvage value of $238,000. The period used in calculating the depreciation deduction was 24 years. The lines were sold, however, two years after they were placed into operation and a price of $2,407,000 was received. From the perspective of any reasonable understanding of the words "ordinary" and "extraordinary," the retirement in this case must be termed extraordinary.[5] *Cf.* Treas.

Reg. § 1.167(a)–8(b) (a retirement is "abnormal" if the asset is withdrawn at a time outside of the range of years taken into consideration in fixing the depreciation rate).

Finally, in support of its position Lake Superior can point to no policy underpinning the CLARD system. The system is "designed to minimize disputes between taxpayers and the Internal Revenue Service as to the useful life of property, and as to salvage value, repairs, and other matters." Treas.Reg. § 1.167(a)–11(a). When an asset is retired, disputes as to useful life and salvage value disappear. All of the facts are fixed so that a known gain can be recognized and the asset can be removed from its vintage account.

## III. THE TREATMENT OF CERTAIN COLLECTED FEES

Section 118(a) of the Internal Revenue Code states that "[i]n the case of a corporation, gross income does not include any contribution to the capital of the taxpayer." For many years the Internal Revenue Service treated contributions to public utilities to aid in the construction of facilities as nontaxable contributions to capital. The service reversed its position in a revenue ruling in 1975. *See* Rev.Rule 75–557, 1975–2 C.B. 33. Congress was quick to respond to this ruling in the Tax Reform Act of 1976, Pub.L. No. 94–455, 90 Stat. 1520, by amending § 118 of the Internal Revenue Code. This act provided that any amount of money or property received by a regulated public utility, which provides water or sewage services, may be excluded from the utility's gross income if "such amount is a contribution in aid of construction." *See* Pub.L. No. 94–455, § 2120(a). Moreover, Congress delegated to the Secretary of the Treasury the authority to define by regulations the term "contribution in aid of construction" *except* that this term

---

**5.** It should be noted that the Treasury regulations' definition of "extraordinary retirement" might, by its literal terms, encompass a retirement made for a routine cause at or near the end of the class life used in calculating the annual depreciation deduction. In this case, we do not have to decide whether the Commissioner's treatment of such a routine retirement as "extraordinary" would be legitimate.

"shall not include amounts paid as customer connection fees (including amounts paid to connect the customer's property to a main water or sewer line and amounts paid as service charges for starting or stopping services). *See id.* Congress again amended § 118 in the Revenue Act of 1978, Pub.L. No. 95–600, 92 Stat. 2763. The exclusion from gross income of amounts collected as "contributions in aid of construction" was extended to electric energy and gas utilities. *See* Pub.L. No. 95–600, § 364. This amendment was made retroactive to apply to contributions made after January 31, 1976.

The result of this flurry of activity is that a "contribution in aid of construction" is excludable from an electric utility's gross income; however, "amounts paid as customer connection fees" are not such contributions and thus must be included in gross income, *see* 26 U.S.C. 118(b)(3)(A). With this statutory framework in mind, Lake Superior brought this action contending that the Commissioner erred in including in gross income fees collected by Lake Superior in 1976 as "Primary and Overhead Line Extension Charges," "Transformer Charges," and "Underground Service Extension Charges." Lake Superior had the burden of proving that the Commissioner erred. *See* Tax Court Rule 142; *Barnes v. Commissioner of Internal Revenue,* 408 F.2d 65, 68 (7th Cir.), *cert. denied,* 396 U.S. 836 (1969). The parties agreed to submit the case to the Tax Court on stipulated facts, without a trial; the submission of the case in this manner did not affect Lake Superior's burden of proof. *See* Tax Court Rule 122(b).

## A. *Primary and Overhead Line Extension Charges*

An electric utility's system of power lines is designed, of course, to deliver electricity to customers. Different power lines in the system, however, have different specific functions. A high-voltage *transmission* line carries electricity to a utility's substation. The voltage is cut by a transformer at the substation and the electricity is generally then carried along a *distribution* line to the vicinity of customers. A *service* line is used to connect an individual customer to the utility's distribution line. This connection is sometimes referred to as a "service drop."

When a party wants to become connected to the utility's system, that party might have to pay the utility a fee to cover the cost of extending the utility's lines. Often only a service line is needed; occasionally a distribution line must be added and very rarely a transmission line must be constructed. To this point the parties are in agreement. There is also no dispute as to the appropriate tax treatment of fees collected by utilities to cover the cost of extending power lines to new customers. Fees collected from customers to pay for the cost of installing or extending a "main" line are *not* customer connection fees and thus are nontaxable contributions in aid of construction. *See* Sen.Rep. No. 1263, 95th Cong., 182 n. 4, *reprinted in* 1978 *U.S.Code Cong. & Ad.News* 6761, 6945 n. 4; 122 Cong.Rec. 30725 (daily ed. Sept. 16, 1976) (statements of Senators Gravel and Long). An electric utility's *distribution* line is conceded by the Commissioner to be a "main" line and thus fees collected to erect or extend a distribution line are nontaxable. Fees collected to cover the cost of extending a *service* line to a customer, however, are customer connection fees and must be reported in the utility's gross income. *See* Sen.Rep. No. 1263, *supra,* at 182 n. 4.

In 1976 Lake Superior collected $23,209.33 from customers for fees that it labeled in the Tax Court "Primary and Overhead Line Extension Charges." The Commissioner included this amount in Lake Superior's gross income for 1976. To prove that this was an error, Lake Superior carried the burden in the Tax Court of proving that some or all of these fees were collected to cover the cost of extending the company's distribution or transmission lines. *See generally* Conference Committee Report, Sen.Rep. No. 1236, 94th Cong., 502, *reprinted in* 1976–3 C.B. (Vol. 3) 807, 906 (when utility receives lump-sum payment for extending facilities, the portion that qualifies for nontaxable treatment under

§ 118 must be determined based on the factual circumstances of each particular case).

■ We hold that Lake Superior failed to carry its burden of proof. As noted above, the case was submitted fully on stipulated facts. The stipulations state that Lake Superior did not charge any customer a fee for extending overhead power lines if the extension required to reach the customer did not exceed a specified distance. If the required extension exceeded the free limit, the customer paid the utility a fee equal to the estimated cost of the extension beyond the free limit; $23,209.33 was collected for this purpose in 1976. The stipulations do not state whether any or all of the money collected was used to cover the cost of extending service lines; such fees are included in gross income. It is certainly possible that Lake Superior's transmission and distribution lines were all in place before 1976 and that the 1976 fees were collected only to extend long service lines to customers. Because Lake Superior did not prove that this was not the case, the company did not demonstrate that the Commissioner erred in including the $23,209.33 in gross income.

On appeal, Lake Superior contends that no fee was collected in 1976 for extending a service line beyond the free limit; all fees were collected to extend distribution lines. As Lake Superior admits, however, the stipulations do not reveal these "facts." Moreover, before the case was submitted to the court, the court asked Lake Superior's attorney: "Is there any problem as far as you're concerned, Mr. Harris, with the stipulation?" The attorney replied, "No." It is too late now for Lake Superior to carry its burden of proof that it failed to carry in the Tax Court.

B. *Transformer Charges*

■ The stipulations state that in 1976 Lake Superior collected $5,747.13 from customers to install transformers and transformer pads between Lake Superior's distribution lines and underground "lines to individual customers' homes and businesses." The Commissioner included this amount in the utility's gross income. We believe that Lake Superior failed to prove that the Commissioner erred in this regard.

Customer connection fees, which must be added to gross income, include "amounts paid to connect the customers' line to an electric line," 26 U.S.C. § 118(b)(3)(A). This rather cryptic language is given some definition by the Senate Report accompanying the Revenue Act of 1978. The report states that a customer connection fee "includes amounts for the installation of the connecting line between the main line and the customer's line located in his home" or business. Sen.Rep. No. 1263, 95th Cong., 182 n. 4, *reprinted in* 1978 *U.S.Code Cong. & Ad.News* 6761, 6945 n. 4; *accord* Conference Committee Report, Sen.Rep. No. 1236, 94th Cong., 502, *reprinted in* 1976–3 C.B. (Vol. 3) 807, 906. From this statement it is evident that the definition of a "customer connection fee" is not limited to a charge made to a customer to cover the cost of the wire running from the utility's distribution line to the customer's home or business. Rather, other costs related to the "installation" of the connection are taxable. Indeed, Congress has specifically indicated that fees charged to cover the cost of "meters" are taxable customer connection fees. *See* Conference Committee Report, Sen. Rep. No. 1236, 94th Cong., 502, *reprinted in* 1976–3 C.B. (Vol. 3) 807, 906.

Lake Superior did not prove, by the stipulations, that the transformer charges made to customers in 1976 were *not* taxable customer connection fees. The stipulated facts are consistent with the possibility that the fees were used to install one transformer for each customer at the point where the customer's service line met a distribution line. The transformers, therefore, may be quintessential connectors—connecting individual service lines to distribution lines. *See generally* 122 Cong.Rec. 30735 (daily ed. Sept. 16, 1976) (remark of Sen. Long) (fees "paid by customer in order to . . . connect the utility's main to the customer's property are considered a customer connection fee."). Moreover, if each transformer was installed to serve one customer only, then the trans-

formers are analogous to meters or service lines; there is one transformer, as there is one meter and service line, for each customer. A fee paid by a customer to cover the cost of installing a meter or service line is clearly a taxable customer connection fee.

If Lake Superior had demonstrated that the transformer charges were collected to install transformer units designed to serve more than one customer, our conclusion might be different. Such units might well be considered analogous to distribution or transmission lines; therefore fees paid to install the transformers would be nontaxable contributions in aid of construction. Absent proof that such multi-customer transformers were installed, however, the Commissioner's inclusion of the transformer charges in Lake Superior's gross income must be affirmed.

## C. *Underground Service Extension Charges*

In 1976 Lake Superior did not charge a fee for extending an overground service line to a customer if the length of the extension was within a specified limit. A fee was charged, however, if the customer wanted the service line placed underground; in 1976 Lake Superior collected $43,856.50 in such fees. The Commissioner included this amount in the utility's gross income for that year.

█ We believe that the Tax Court correctly affirmed the Commissioner's decision. As noted above, the parties agree that fees paid to extend service lines to individual customers are customer connection fees and thus must be included in gross income. A service line does not become less of a service line merely because it extends underground. Indeed, the Senate Report accompanying the Revenue Act of 1978, states that a taxable "customer connection fee

includes amounts for the installation of the connecting line [*i.e.* service line] between the main line and the customer's line located in his home ... regardless of whether that connecting line was located on or *under* [the customer's] property ...." Sen. Rep. No. 1263, 95th Cong., 182 n. 4, *reprinted in* 1978 *U.S.Code Cong. & Ad.News* 6761, 6945 n. 4 (emphasis added).

Lake Superior contends that because a no-cost alternative existed, a fee paid to extend a service line underground was paid as a "customer preference" and not as a taxable customer connection fee. We are not persuaded by this example of linguistic gymnastics. In a sense, whenever a customer pays a fee for a good or a service, the fee is paid as a "customer preference." If Lake Superior charged a fee for running a service line above ground, one could say that customers do not pay the fee for the service line; rather the fee is paid because the customers prefer having electricity instead of living without power in their homes.

Lake Superior's argument is reduced, therefore, to the contention that *only* fees paid to cover the cost of extending a service line in the cheapest manner possible are taxable customer connection fees; all other fees to cover the cost of extension are nontaxable. Lake Superior is asking us to make a distinction that Congress did not make. Section 118(b)(3)(A) of the Internal Revenue Code simply states that taxable customer connection fees include "amounts paid to connect the customer's line to an electric line ...." There is no indication that these amounts are rendered nontaxable merely because a no-cost or lower-cost alternative existed for the customer. Our task is to interpret the statute's words in their ordinary, everyday senses and not to put words into the statute that Congress did not put there.[6] *See International Trad-*

6. Some customers of electric utilities might have very peculiar needs. When such a customer becomes connected to a utility's distribution system, therefore, the utility might have to purchase or build special equipment or facilities designed to serve only that customer. The customer, moreover, might be charged a fee to

cover the cost of obtaining and installing the special equipment. It would be a difficult case if we had to decide whether such a fee is a taxable customer connection fee; we can see arguments on both sides. The case before us, however, does not present this difficult problem. Extending a simple service line under-

*ing Co. v. Commissioner of Internal Revenue,* 484 F.2d 707, 713 (7th Cir.1973). The Tax Court, therefore, correctly determined that fees collected to extend service lines underground to customers were taxable customer connection fees.[7]

## IV.

For the reasons expressed in this opinion, the judgment of the Tax Court is affirmed.

ground to a customer's house or business is a routine matter; fees to cover these expenses are clearly taxable customer connection fees.

**7.** On the audit, once the Commissioner determined that certain fees collected in 1976 were taxable customer connection fees, property purchased with those fees became eligible for an investment tax credit. The Commissioner, therefore, increased Lake Superior's investment tax credit accordingly. After the Tax Court issued its opinion in this case, the parties submitted computations pursuant to the court's findings and conclusions. At that time, Lake Superior contended that the Commissioner

made a factual error and understated the investment tax credit owing to Lake Superior in 1976. Although Lake Superior was aware of this alleged factual error before the case was brought to the Tax Court, no objection was made until after the court issued its opinion and the parties were submitting their computations under Tax Court Rule 155. At that time it was too late to raise a new issue, *see* Tax Court Rule 155(c); therefore, the court properly accepted the Commissioner's computation.