FLORIDA PROGRESS
CORPORATION,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 93–246–CIV–T–25A.

United States District Court,
M.D. Florida,
Tampa Division.

Dec. 2, 1999.

---

Terry West Cobb, Florida Progress Corp., St. Petersburg, FL, Gregory L. Nelson, David E. Jacobson, Washington, DC, Richard P. Swanson, Reid & Preist, LLP, New York City, Gary W. England, Florida Progress Corp., St. Petersburg, FL, for Plaintiff.

David N. Geier, Ann Reid, U.S. Dept. of Justice, Tax Division, Washington, DC, for Defendant.

### ORDER

ADAMS, District Judge.

Before this Court are Defendant's Motion for Summary Judgment (Dkt.32) and Plaintiff's Motion for Partial Summary Judgment as to Liability (Dkt.36). This action is primarily an action for refund of federal income taxes paid by Plaintiff for the years 1982 through 1985. Additionally, Defendant seeks to reopen Plaintiff's tax returns for the years 1976 through 1981 to assess further federal income taxes. This Court, having considered the facts and the arguments of counsel and being otherwise fully advised, hereby grants in part (as to the years 1982 through 1985), and denies in part (as to the years 1976 through 1981), the Defendant's Motion for Summary Judgment and hereby grants in part (as to the years 1976 through 1981), and denies in part (as to the years 1982 through 1985), the Plaintiff's Motion for Partial Summary Judgment as to Liability.

### I. FACTS

(The following is a brief summary of the 150–plus pages of facts and exhibits to which the parties have stipulated as the entire factual record for these cross motions for summary judgment.) Plaintiff, Florida Progress Corporation, is the parent holding company of Florida Power Corporation (hereinafter "Florida Power"), a regulated public utility. Florida Power is engaged in the creation, distribution, and sale of electricity to retail and wholesale customers. Florida Power is subject to the regulatory jurisdiction of the Florida Public Service Commission (hereinafter "FPSC") for sales to retail customers and the Federal Energy Regulatory Commission (hereinafter "FERC") for sales to wholesale customers. See 42 U.S.C. § 7172(a)(1)(B), 16 U.S.C. § 824 and Fla. Stat. § 366.04. The parties have stipulated that, insofar as is relevant in this case, the FPSC has adopted the FERC rules, including the Uniform System of Accounts. (Stip. pp. 2–3, ¶ 6). The schedule of rates and charges that Florida Power may col-

lect from its customers is governed by its "Tariff" that must be approved by the FPSC. (Stip. Exhibit A); *See* FPSC Rule 25–6.033. The FPSC and Florida Power's Tariff allows Florida Power to collect revenues through various methods including monthly base rate fees, initiation of service fees, and fees for the extension of power lines and facilities. Each of these types of revenue will be discussed below.

### A. Monthly Base Rate Fees

Florida Power provides retail electric service at a regular monthly base rate (as approved by its Tariff) which is a charge to a customer per kilowatt hour of electricity used. (Stip. pp. 3–4, ¶ 10). Florida Power's monthly base rate is designed to compensate Florida Power for the cost of providing electricity, plus a reasonable rate of return on assets used to provide electricity. (Stip. p. 4, ¶ 11). The fees collected through the monthly base rates were included in Florida Power's taxable income for all years in question and are not at issue in this case. (Stip. p. 4, ¶ 12).

### B. Initiation of Service Fees

Florida Power is empowered to charge additional fees for the initiation of service to a new customer. (Stip. p. 5, ¶ 13) Some of the fees include:

*New Electric Service:* a flat fee for connecting a new customer for electric service where installation of a new meter is required.

*Straight Reconnection:* a flat fee for connecting a new customer for electric service where the installation of a new meter is not required.

*Read Only:* a flat fee for simply reading the meter of a new customer when electric service to the premises is not actually disconnected.

*Reconnection:* a flat fee for reconnecting a customer whose electric service was disconnected for nonpayment.

(Stip. pp. 10–11, ¶ 35); *See* FPSC Rules § 25–6.095(3). The above fees *are not de-* *signed to compensate* Florida Power for the construction of facilities, but rather to defray the cost of establishing new or existing service. (Stip. p. 11, ¶ 36). All fees collected for the initiation of service *were included in Florida Power's taxable income* for all years in question and are not at issue in this case. (Stip. p. 11, ¶ 38).

### C. Extension of Power Lines and Facilities

Florida Power is also authorized to charge additional fees for the extension of power lines and facilities to new customers. (Stip. pp. 11–12, ¶¶ 39–40). The fees charged for the installation of power lines and facilities have been broken down into two categories: Extension of Facilities Charges (hereinafter "EFC's") and Residential Electric Underground Extensions (hereinafter "REUE"). (Stip. p. 12, ¶ 39 and Exhibit A); *See* FPSC Rule 25–6.064, *et seq.* The extensions are required to be installed in the most economical and practical means unless the customer requests a different type of installation. (Stip. p. 12, ¶ 40). Since the underground extensions are typically more expensive than the overhead extensions, the extensions are usually installed overhead unless the customer requested underground installation. Therefore, the EFC's have been further broken down between overhead and underground categories. (Stip. p. 15, ¶ 50).

### 1. Overhead Extension of Facilities Charges

Florida Power charges the overhead EFC's when anticipated revenues from the customer are not sufficient to cover the costs of the extensions. (Stip. p. 15, ¶ 51). The formulas for determining the overhead EFC's are set forth in FPSC Rule 25–6.064 and are reprinted in Stipulation Exhibit A, page 6–43. Florida Power now concedes that the overhead EFC's received during the years 1982 through 1985 tax years are taxable customer connection

fees. (Stip. p. 15, ¶ 52).[1] Therefore, the overhead EFC's are not at issue before this Court.

### 2. Underground Extension of Facilities Charges

The underground EFC's are calculated as the excess cost of an underground extension over and above the cost of an overhead extension. (Stip. p. 16, ¶ 54 and Exhibit A p. 6–43); *See* FPSC Rule 25–6.064(5). If the overhead extension is the most economical and practical means, then the customer must pay the underground EFC's to receive an underground extension. (Stip. p. 16, ¶ 55). Florida Power did not include the following amounts of underground EFC's on its tax returns for the years 1982 through 1985:

| | |
|---|---|
| 1982 | $ 89,307.30 [2] |
| 1983 | 245,125.87 |
| 1984 | 299,701.45 |
| 1985 | 239,927.17 |

(Stip. p. 17, ¶ 57).

Florida Power contends that the underground EFC's are non-taxable Contributions–in–Aid–of–Construction (hereinafter "CIAC") under 26 U.S.C. § 118(b).[3] (Stip. p. 16, ¶ 56). Upon IRS audit of Florida Power's 1982 through 1985 tax returns, the IRS determined that the underground EFC's should have been included into taxable income as customer connection fees and assessed a tax deficiency. (Id.) Florida Power paid the tax deficiency and now seeks a refund of these taxes. Therefore, the taxability of the underground EFC's is at issue before this Court.

### 3. Residential Electric Underground Extensions

The REUE charges are similar to the underground EFC's except that they only pertain to residential subdivisions and the costs are estimated over an expected cost of a "model subdivision" which is estimated annually instead of on an individual customer basis. (Stip. p. 18, ¶ 60). The REUE charges are even credited against the underground EFC's. (Id.) Customers would not have received underground service without paying the REUE charges. (Stip. p. 18, ¶ 60). Florida Power did not include the REUE charges in it's 1982 through 1985 federal income tax returns. (Stip. p. 18, ¶ 61). After the IRS audit of Florida Power's 1982 through 1985 income tax returns, Florida Power conceded that the REUE charges attributable to providing underground facilities that service only one customer are taxable income. (Stip. p. 19, ¶¶ 62–63). The IRS does not contest that the portions of the REUE charges attributable to providing underground facilities to more than one customer are non-taxable CIAC under § 118(b). (Stip. p. 19, ¶ 62). Florida Power agreed to the following adjustments to income for REUE charges:

| | |
|---|---|
| 1982 | $ 928,905.62 [4] |
| 1983 | 1,402,246.11 |
| 1984 | 2,500,223.85 |
| 1985 | 2,631,292.69 |

(Stip. p. 19.¶ 64). The income taxes attributable to the REUE charges are not at

---

1. Florida Power did not include the overhead EFC's in its 1982 through 1985 tax returns and the IRS required these amounts to be included upon audit.

2. Defendant seeks to adjust Florida Power's 1982 income for items excluded from income during 1976 through 1981. The 1982 figure does not include any these adjustments. Since the Plaintiff's Motion for Partial Summary Judgment as to Liability (Dkt.36) for the years 1976 through 1981 has been granted herein, the court will not adjustment to the 1982 figure.

3. All section numbers refer to 26 U.S.C. (the Internal Revenue Code) for the years 1976 through 1985 unless otherwise noted. It should also be noted that code § 118 changed dramatically in 1986 and again in 1996.

4. This figure does not include any adjustments for the tax years 1976 through 1981.

issue before this Court. However, Florida Power contends that it should be allowed to take a current tax deduction for a portion of the EFC and REUE charges attributable to trenching the service laterals.

### D. Trenching Costs For Service Laterals

In the construction and installation of underground facilities, Florida Power incurs certain costs, such as the costs of trenching the underground pathways for the installation of service laterals. (Stip. p. 20, ¶ 65). Service laterals may be generally defined as the power lines between the secondary conductors or transformers (including risers at poles or other structures) and the point of delivery, such as the customer's power meter. (Stip. p. 9, ¶¶ 28–29); *See* FPSC Rule § 25–6.003(11). Florida Power includes in the term "trenching costs" the costs for direct labor, indirect labor (including administrative and clerical labor), and equipment and transportation costs (including depreciation for vehicles, operating expenses and repairs). (Stip. p. 20, ¶ 66). The service laterals are underground facilities owned by Florida Power and have a useful life in excess of one year. (Stip. p. 20, ¶ 67). Florida Power contends that it should be allowed a current tax deduction in the year the trenching costs of the service laterals are incurred. (Stip. p. 22, ¶ 73). Florida Power is claiming a deduction only to the extent that it received EFC's and REUE charges for the service laterals. (Stip. p. 21, ¶ 69). The amounts that Florida Power contend should be allowed as current tax deductions are as follows:

|  | Underground EFC's | REUE Charges |
|------|------|------|
| 1982 | $ 9,981.55 | $ 507,639.70 |
| 1983 | 72,343.17 | 1,050,523.54 |
| 1984 | 90,705.81 | 1,754,982.16 |
| 1985 | 104,976.99 | 1,758,444.90 |

(Stip. p. 23, ¶ 74).

Defendant denies the deductibility of the trenching costs and asserts that they should be capitalized as part of the service laterals and depreciated pursuant to §§ 167 and 168. Therefore, the deductibility of the "trenching costs" is at issue in this case.

### E. Florida Power's Accounting

Florida Power is subject to the regulatory jurisdiction of the Florida Public Service Commission, FPSC, for sales to retail customers and the Federal Energy Regulatory Commission, FERC, for sales to wholesale customers. *See* 42 U.S.C. § 7172(a)(1)(B), 16 U.S.C. § 824 and Fla. Stat. § 366.04. The parties have stipulated that insofar as is relevant in this case, the FPSC has adopted the FERC rules, including the Uniform System of Accounts. (Stip. pp. 2–3, ¶ 6). Florida Power is permitted by the FPSC to earn a rate of return on the cost of its assets used in the provision of utility services. (Stip. p. 26, ¶ 84). These assets are referred to as its rate base. (Id.) The Uniform System of Accounts places in Account 101 (titled Electric Plant in Service, hereinafter "EPIS") the original cost of Florida Power's electric plants and facilities owned and used in its utility operations which have an expected life of more than one year. (Stip. p. 23, ¶ 75). The EPIS account is used to calculated Florida Power's rate base to earn a rate of return on its assets. However, the Uniform System of Accounts does not allow any of the costs to extend power lines and facilities (*overhead or underground*) to be included in the EPIS account to the extent that Florida Power is reimbursed through EFC's or REUE charges. (Stip. p. 26, ¶¶ 82–83). Therefore, Florida Power's accounting methods under the Uniform System of Accounts do not allow a rate of return to be earned for the power lines and facilities reimbursed by EFC's or REUE charges (*whether overhead or underground*). (Stip. p. 26, ¶ 26).

### F. Tax Years 1976 through 1981

Florida Power also excluded the EFC's and REUE charges during the years 1976 through 1985. (Stip. p. 26, ¶ 85). However, the period in which the IRS may assess taxes is normally limited to three years from the due date of the return under § 6501. In this case, by the time the IRS determined the erroneous exclusions, the § 6501 three-year limitation period for assessing taxes expired for the years prior to 1982. (Stip. p. 29, ¶ 95). However, there are a few exceptions to the 3–year statute of limitations, such as a change in accounting method pursuant to § 481. (Stip. p. 27, ¶ 86). In this case, Defendant claims that changes[5] already made to Plaintiff's tax returns for the years 1982 through 1985 constituted a change in accounting method under § 481 that would allow Defendant to reopen the years 1976 through 1981. (Stip. p. 27, ¶ 86). Section 481, if applicable, would allow Defendant to include an additional $5,159,850.36 of taxable income in Plaintiff's 1982 income tax return. (Stip. p. 27, ¶ 88). Florida Power claims that the exclusion of the amounts in question were not a change in a method of accounting under § 481. (Stip. p. 27, ¶ 86). Defendant also argues that if the trenching costs are allowed as a tax deduction when incurred, then it is a change in accounting method under § 481, and Defendant should be able to adjust 1982's income tax return for items excluded from taxable income during 1976 through 1981. (Stip. p. 23, ¶ 74).

### II. STANDARD ON SUMMARY JUDGMENT

Summary judgment may not be granted unless the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56. The moving party satisfies its burden by showing an absence of evidence to support an essential element of the nonmoving party's case. *Celotex*, 477 U.S. 317, 106 S.Ct. 2548. Once the moving party demonstrates the absence of a genuine material fact, whether or not accompanied by affidavits or other proof, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (*quoting* Fed.R.Civ.P. 56(e)); *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1382 (11th Cir.1990).

### III. ISSUES

1. Under § 118(b), whether the underground EFC's collected by Florida Power during the tax years 1982 through 1985 constitute non-taxable Contributions–in–Aid–of–Construction.

2. Under §§ 446 and 481, whether Defendant's inclusion of the EFC's and REUE charges that had previously been excluded from Florida Power's tax returns for the years 1982 through 1985 constitute a change in accounting method that would allow Defendant to adjust income for years prior to 1982 which would otherwise be closed tax years under § 6501.

3. Under § 162, whether Florida Power is entitled to current income tax deductions for trenching costs associated with REUE charges and the EFC (if the EFC's are found not to be CIAC)

---

5. These changes include the overhead EFC's and other items that Florida Power agreed to include into income after being audited.

during the tax years 1982 through 1985.

4. If Florida Power is allowed to take current income tax deductions for trenching costs for the tax years 1982 through 1985, then under §§ 446 and 481, whether Florida Power's change from capitalizing the trenching costs to currently deducting the trenching costs constitute a change in accounting method that would allow Defendant to adjust income for years prior to 1982 despite the fact that the statute of limitations for amending returns has passed for those years.

**A. The Underground Extension of Facility Charges Are Taxable Connection Fees, Not Contributions–in–Aid–of–Construction.**

Under § 61(a) of the Internal Revenue Code, "gross income means all income from whatever source derived" unless it is specifically excluded from gross income somewhere within the Internal Revenue Code. Taxable income is defined under § 63 as gross income less any allowable deductions. Thus, any revenues collected by Florida Power from its customers would be considered gross income under § 61(a) and therefore taxable income under § 63 unless there is a specific exclusion for that type of revenue. Section 118(b) provides a possible exclusion providing that a "Contribution–in–Aid–of–Construction" to a regulated public utility may be excluded from gross income. Plaintiff argues in its Motion for Partial Summary Judgment as to Liability (Dkt.36) that the underground EFC's fall within the gross income exception of § 118(b) as Contributions–in–Aid–of–Construction. Defendant argues in its Motion for Summary Judgment (Dkt.32) that the underground EFC's are gross income not within any exception. An in-depth look into the legislative history and judicial interpretations of § 118(b) is necessary to determine whether the underground EFC's fall within the gross income exception of § 118(b).

**1. The History of § 118(b).**

The § 118(b) exclusion from gross income of non-shareholder contributions to a corporation's capital derives its earliest foundations from a line of cases beginning in the mid–1920's with *Edwards v. Cuba R.R. Co.*, 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124 (1925). In *Edwards* the Supreme Court held that Government subsidies to a railroad to induce the construction of railroad facilities in Cuba were not taxable income within the meaning of the Sixteenth Amendment. After *Edwards*, courts held for almost twenty years that held that payments to various railroad and electric companies to induce the extension of services did not constitute gross income. *See, e.g., Tampa Electric Co. v. Comm'r*, 12 B.T.A. 1002, 1928 WL 662 (1928), acq., VII–2 C.B. 39 (1928). The issue appeared to be settled until 1943 when the Supreme Court rendered its decision in *Detroit Edison Co. v. Comm'r*, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943).

In *Detroit Edison* the Supreme Court decided that payments made by prospective customers to extend service lines to rural areas were not contributions to the company but the price for receiving electric service. *Id.* at 102–03, 63 S.Ct. 902. Then the Supreme Court, in *U.S. v. Chicago, Burlington and Quincy R.R. Co.*, 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973), found that government payments for specific quantifiable services, in this case improvements at grade-crossings and intersections, were not characteristic of a contribution to capital. After the Supreme Court's holdings in *Chicago, Burlington* and *Detroit Edison* the IRS withdrew its acquiescence to some of the earlier contribution-to-capital cases. *Public Utility's Connection Fee Including Constr. Charge,*

Rev. Rul. 75–557, 1975–2 C.B. 33, 1975 WL 34532 (1975).

In Revenue Ruling 75–557, the IRS announced that certain fees collected by water utility companies from potential customers would not be considered contributions to capital under § 118. The fees included charges for furnishing and installing a service line and water meter to the water line running to the purchaser's lot. The IRS reasoned that "since the connection fees charged to a new lot owner are necessary to obtain water services, the amounts will constitute gross income to the taxpayer under § 61." Rev. Rul. 75–557.

In 1976 Congress amended § 118 to codify the already existing case law with regard to Contributions–in–Aid–of–Construction to water and sewage disposal utilities. Tax Reform Act of 1976 ("TRA of 1976"), Pub.L. No. 94–455, 90 Stat. 1520. Congress added § 118(b) to reflect the non-taxability of contributions to water and sewage disposal utilities to encourage the extension of facilities into new areas. However, Congress carved out an exception for customer connection fees, to reflect Revenue Ruling 75–557. As to customer connection fees, the final Conference Committee reported:

> [N]ontaxable treatment will not be accorded to customer connection fees. Customer connection fees include any payments made by a customer to the utility for the cost of installing the connection between the customer's property and the utility's main water or sewer lines (including the cost of meters and pipes) and any amounts paid as service charges for stopping or starting service.

H.R.Rep. No. 1515, 94th Cong., 2d Sess. 502 (1976), *reprinted in* (1976) U.S.C.C.A.N. 4118, 4205. Thereafter, as the Supreme Court held in *Edwards*, payments made by a government or other group to a utility to encourage the extension of facilities into new areas benefitting a large number of people would be given tax free status; however, as the Supreme Court held in *Detroit Edison* and as the IRS recognized in Revenue Ruling 75–557, payments made by an individual or a business entity to a utility as a prerequisite to receiving water or sewage service would be treated as taxable income to the utility. In 1978, Congress extended the gross income exception of § 118(b) to include public gas and electric utilities retroactively to February 1, 1976. Revenue Act of 1978, Pub.L. No. 95–600, 92 Stat. 2763, sec. 364. Section 118(b) remained materially unchanged during the years in question until 1986 when the non-tax treatment of Contributions–in–Aid–of–Construction was repealed by the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat.2085.

### 2. Florida Power's underground EFC's are taxable customer connection fees.

▮ Defendant argues that it is entitled to summary judgment because the underground EFC's are customer connection fees which are specifically excluded from the § 118(b) definition of Contributions–in–Aid–of–Construction. In determining whether the underground EFC's constitute connection fees, this Court must recognize that the Supreme Court has consistently held that gross income exclusionary provisions, such as § 118(b), must be narrowly construed. *Comm'r v. Schleier*, 515 U.S. 323, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995). Therefore, where Congress has provided that customer connection fees are not Contributions–in–Aid–of–Construction, this Court must give great weight to the plain and unambiguous meaning of "customer connection fees" as well as Congress' intent so that the "sweeping scope" of § 61 will not be thwarted. *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955). Congress, in its

final[6] committee report, clearly defined "customer connection fees" as payments by a customer to a utility to connect the customer's property to the utility's main line. H.R.Rep. No. 1515, 94th Cong., 2d Sess. 502 (1976), *reprinted in* (1976) U.S.C.C.A.N. 4118, 4205. Therefore, the only issue remaining with respect to the underground EFC's is whether they were fees to connect the property to the main line or were instead fees to reimburse the utility for the main line.

Plaintiff argues that the fees collected for extending underground facilities to customers should be taxable customer connection fees only to the extent that they pertain to the service lateral portion of the extension, the last segment of an underground extension. In other words, Plaintiff relies on *Lake Superior District Power Company v. Commissioner of Internal Revenue* to argue that underground EFC's collected for extensions prior to the service lateral segments would be fees to reimburse the utility for the "main line." *Lake Superior District Power Co. v. C.I.R.,* 701 F.2d 695 (7th Cir.1983) (affirming *Lake Superior District Power Company v. C.I.R.,* T.C. Memo 1981–28, 1981 WL 10787 (1981)).

A portion of the facts and arguments in *Lake Superior* are very similar to the present case. Lake Superior appealed an IRS deficiency related to similar fees collected from customers. *Id.* at 697. The court discussed in detail the method in which each segment of a power line system is broken down until it reaches the final customer. *Id.* at 700. The court noted

that distribution lines deliver power to transmission lines which in turn carry power to service laterals which in turn deliver power directly to the customer. *Id.* The court recognized that distribution and transmission lines carry large amounts of voltage and *usually* serve more than one customer, although they may serve only one customer. *Id.* Alternatively, service laterals carry smaller amounts of voltage and *usually* service only one customer. *Id.* The court also noted that a new customer often only needs a service lateral to begin receiving power. *Id.*

The Commissioner in *Lake Superior* conceded that fees collected for distribution lines were nontaxable Contributions-in-Aid-of-Construction, which in essence was a concession that the distribution lines were "main lines." *Id.* The parties also agreed that fees for service laterals were taxable connection fees. *Id.* The court found that Lake Superior failed to prove that "some or all of these fees were collected to cover the cost of extending the company's distribution or transmission lines," i.e. that the fees were collected for main lines. *Id.* Based on that finding, the court affirmed the lower court's finding that the fees collected were taxable connection fees not within the § 118(b) exception.[7] *Id.*

Using the Seventh Circuit's reasoning, Plaintiff claims that its underground extension fees are not for service laterals, but solely for distribution and transmission lines or the underground equivalent. (Dkt.36, pp. 33–35). Therefore, Florida Power argues that all the fees at issue are

---

**6.** Florida Power, in its Memorandum of Law in Support of its Motion for Summary Judgment as to Liability (Dkt.37, p. 30), cites to a portion of the 1976 Senate Report on § 118(b) which would have allowed customer connection fees to be excluded from gross income. The Court notes that the opposite position was taken in the final committee report.

**7.** The court also noted that it was improper on appeal for Lake Superior to attempt to prove that a part of the fees charged was for distribution and transmission lines when those facts were not revealed to the lower court.

for "main lines" which would be non-taxable CIAC's under § 118(b). However, this case is distinguishable from *Lake Superior* for two very important reasons. In *Lake Superior*, the IRS conceded that the distribution lines were "main lines." In this case, Defendant has not made any concessions concerning distribution and transmission lines. In fact, Defendant argues that fees collected from a utility customer for distribution and transmission lines that serve only that customer are "customer connection fees" within the meaning of § 118(b). (Dkt.33, p. 20).

The other distinguishing factor is that the court in *Lake Superior* did not address the issue of how many customers the distribution and transmission lines in fact serviced. However, the parties in this case *stipulate* that all the fees at issue "were paid by a single customer ... to recover part of the cost of providing the requested electrical service to a single customer." (Stip. p. 13, ¶¶ 42–43). The parties in this case even go so far as to stipulate that each of the fees collected for distribution and transmission lines, regardless of the people they may potentially serve, were installed only to serve one customer and did only serve the customer who requested and paid for the facility until at least until February 19, 1995, the date of the stipulation of facts. (Id.)

■ Though not faced with the issue, the court in *Lake Superior* noted that if the facilities were installed to serve only one customer, then the fees charged for facilities would be analogous to fees for meters or service lines which are taxable connection fees. *Lake Superior*, 701 F.2d at 701. Therefore, this Court finds that fees paid by a customer to a utility to extend the utility's service to that customer's property are "customer connection fees" within the meaning of § 118(b) to the extent that the extension facilities are intended to and actually do service only that customer, irrespective of how many customers the extension facilities are capable of serving. Because the parties have stipulated that the underground EFC's were for extension facilities to serve only the individual customers who paid the underground EFC's and in fact only served those individual customers for at least ten years after the fees were paid, the Court finds that the underground EFC's are taxable customer connection fees.

The Court also notes that the only material difference between the overhead EFC's and the REUE charges, both of which Florida Power concedes are taxable connection fees, and the underground EFC's, which Florida Power argues are not taxable connection fees, is that the underground EFC's are incurred at the customer's option. The Seventh Circuit in *Lake Superior* rejected as "linguistic gymnastics," the utility's argument that a fee paid for underground service would be non-taxable because it was paid as a "customer preference." 701 F.2d at 702. This Court rejects Florida Power's argument that the underground EFC's are not customer connection fees because they were additional fees charged at the customer's option to extend the facilities by the more expensive underground route.

■ Finally, Florida Power argues that because the FPSC required financial accounting practices do not allow the underground EFC's to be accounted for as income on Florida Power's books, the underground EFC's should not be included in income for tax purposes. (Stip. p. 26, ¶¶ 82–83). Although a method of financial accounting imposed by a regulatory agency may be of some significance in determining the tax consequences of a transaction, it is not controlling if that method does not clearly reflect income as defined by the tax law. *City Gas Co. v. Comm'r*, 689 F.2d 943, 949 (11th Cir. 1982) (*citing Comm'r v. Idaho Power*, 418

U.S. 1, 15, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974)).

The Uniform System of Accounts does not treat as income the overhead EFC's, the underground EFC's, and the REUE charges. However, Florida Power has stipulated that the overhead EFC's and REUE charges are taxable income. Florida Power cannot therefore seriously argue that the Uniform System of Accounts' treatment of the underground EFC's clearly reflects income. Hence, the Court rejects Florida Power's argument that the Uniform System of Accounts' treatment of the underground EFC's clearly reflects income. The Court holds that the Underground EFC's were taxable customer connection fees and Defendant did not err in assessing additional taxes for the tax years 1982 through 1985 related to the underground EFC's.

**B. Florida Power's Inclusion of the Previously Excluded EFC's and REUE Charges for the Years 1982 Through 1985 Does Not Constitute a Change in Accounting Method Under § 481.**

The next issue before the Court is whether Defendant's inclusion of the EFC's and REUE charges into Florida Power's tax returns for the years 1982 through 1985 constituted a "change in accounting method" under §§ 446 and 481. In its determination of Florida Power's 1982 tax liability, the IRS included in gross income additional charges received by Florida Power (reduced by depreciation) during the 1976 through 1981 tax years. While Defendant concedes that the statute of limitations had expired for the tax years prior to 1982, it argues that a change in the method of Florida Power's accounting occurred in 1982 which thereby permits the IRS to take adjustments from those prior years into account in the 1982 tax year.

Section 446 provides that if the method of accounting used by a taxpayer does not clearly reflect income, the computation of taxable income shall be made under such method which in the opinion of the IRS does clearly reflect income. The Code does not specifically define an "accounting method." However, the implementing regulations provide that a change in accounting method includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. Treas. Reg. § 1.446–1(e)(2)(ii).

■ The essential element of a material item is that it determines the proper time for inclusion of the item into income or the time for the taking of a deduction. Treas. Reg. § 1.4461(e)(2)(ii)(a). If a practice does not permanently change the amount of taxable income, but only changes the tax year in which the taxable income is reported, it involves timing and is therefore considered a method of accounting. *See Knight–Ridder Newspapers, Inc. v. U.S.,* 743 F.2d 781, 799, n. 42 (11th Cir.1984) (analyzing whether an advertising rebate reserve constitutes a "method of accounting" under § 481, and noting that the definition of accounting method applicable to § 446 also applies to § 481).

When applicable, § 481 [8] can affect otherwise closed years and permits the IRS

---

8. Section 481 provides:
   (a) General Rule—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of change")—
   (1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable

income for the preceding taxable year was computed, then
   (2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, . . .

to adjust a taxpayer's income for the "year of the change" to include income earned in the closed years but unreported in those years under the old method of accounting. *See Graff Chevrolet Co. v. Campbell*, 343 F.2d 568, 572 (5th Cir.1965).[9]

■ As decided previously in this opinion, the EFC's (underground and overhead) and REUE charges are taxable customer connection fees. Florida Power did not include these items in gross income during the tax years 1976 through 1985 because Florida Power erroneously believed that they were nontaxable CIAC's. The Commissioner disagreed and adjusted Florida Power's gross income accordingly. Florida Power's exclusions from gross income therefore involve *whether* items would be reported, not *when* they would be reported. As such Florida Power's exclusions from gross income do not involve an issue of timing, and the subsequent change in 1982 does not constitute a change in Florida Power's method of accounting.[10] *See Saline Sewer Co. v. Comm'r*, 1992 WL 79079 (U.S.Tax Ct. April 21, 1992) ("[t]he failure to report customer connection fees as income, and instead treat them as contributions to capital pursuant to section 118, is clearly not a timing issue"). The Court further agrees with the *Saline Sewer* court's conclusion that "the restoration of the depreciable basis is not a timing issue either." *Id.* Therefore Florida Power's inclusion in 1982 of the previously excluded EFC's and

REUE charges does not constitute a change in accounting method under § 481, and Defendant cannot reopen the tax years 1976–1981.

**C. Treaching Costs Are Costs Necessary for the Installation of Equipment and Facilities Having a Useful Life in Excess of One Year and Therefore Must Be Capitalized as Part of the Cost of the Equipment and Facilities.**

The next issue before the Court is whether Plaintiff may currently deduct the trenching costs of installing the underground facilities requested by a customer to the extent that the underground EFC's and REUE charges associated with these underground facilities are included in income. Defendant argues that the trenching costs may not be currently deducted under § 162, but instead must be capitalized onto the extension facilities constructed under § 263 and depreciated over the useful lives of those facilities. Under § 162(a), a taxpayer may deduct "all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." However, § 263 requires amounts to be capitalized to the extent that the amounts paid or incurred are for assets with useful lives in excess of one year. *Ellis Banking Corp. v. Comm'r*, 688 F.2d 1376, 1379 (11th Cir.

---

26 U.S.C. § 481 (emphasis added). The omitted portion of sub-paragraph (2) concerns changes effecting pre–1954 tax years and is inapplicable to this case.

**9.** Section 6501 provides a general three year statute of limitations which prevents the IRS from adjusting tax returns more than three years old. Often, by the time the IRS could audit a taxpayer's return and determine that a change in accounting method has been or needs to be made, the previous years' returns would be closed from IRS adjustment by

§ 6501. Therefore, § 481 has been interpreted to allow the IRS to open tax years that are closed by the general three year statute of limitations of § 6501 if there is a change in accounting method. *See Graff*, 343 F.2d at 571–72.

**10.** Put another way, the Court finds that the erroneous exclusions from Florida Power's income were not caused "solely by reason of the change" in accounting method. *See* 26 U.S.C. § 481(a)(2); *Knight–Ridder*, 743 F.2d at 799 n. 39.

1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3537, 77 L.Ed.2d 1388 (1983).

The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery. While § 162 business expenses are currently deductible against taxable income, § 263 capital expenditures are usually deducted against taxable income over the useful life of the asset acquired or constructed. *INDOPCO, Inc. v. Comm'r,* 503 U.S. 79, 84, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992). More importantly, the § 263 requirement of capitalization takes precedence over the allowance of a deduction under § 162. *See Comm'r v. Idaho Power Co.,* 418 U.S. at 12, 94 S.Ct. 2757. Thus, even if an expenditure is an ordinary and necessary business expense within the meaning of § 162, the taxpayer will still be denied a current deduction and required to capitalize the asset under § 263 if the expenditure is for an asset that has a useful life in excess of one year.

The Supreme Court in *Idaho Power* recognized that the capitalization principle also applies to the costs incurred in constructing the taxpayer's facilities. *Idaho Power,* 418 U.S. at 12, 94 S.Ct. 2757. The Court stated that "[t]here can be little question that other construction-related expense items, such as tools, materials, and wages paid to construction workers, are to be treated as part of the cost of the acquisition of a capital asset." *Id.* at 13, 94 S.Ct. 2757. The stipulation in this case refers to the 'trenching costs' as costs for direct labor, indirect labor, equipment, and transportation costs. (Stip. p. 20, ¶ 66). All of these costs are within the meaning of construction-related expenses referred to in *Idaho Power.*

■ Following the above, if the trenching costs are related to the construction and installation assets that have useful lives in excess of one year, then the trenching costs may not be deducted currently in the year the expenditures are incurred. Instead, the trenching costs must be capitalized under § 263 and depreciated over their useful lives as allowed by the Internal Revenue Code. Because the parties have stipulated that the trenching costs are for the construction and installation of facilities that all have useful lives in excess of one year, it follows that the 'trenching costs' should be capitalized and depreciated over their useful lives under § 263. (Stip.20, ¶¶ 65, 67).

Florida Power makes three arguments in an attempt to show that there is a genuine issue of material fact that would prevent this Court from granting Defendant's motion for summary judgment. First, Florida Power argues that the trenching costs meet all the requirements of § 162, and therefore should be deductible. Second, Florida Power argues that the matching principle requires the trenching costs to be currently deductible. Third, Florida Power argues that since the Uniform System of Accounts does not allow the trenching costs to be included in the 'rate base' used to calculate monthly fees charged to customers, it should be allowed to currently deduct the trenching costs. Each of these arguments fail for the reasons provided below.

1. **Even If the Trenching Costs Meet All the Requirements of § 162, the § 263 Requirement to Capitalize Assets with Useful Lives in Excess of One Year Overrides Section § 162.**

The Court finds Florida Power's argument that the trenching costs must be deductible under § 162 because they are ordinary and necessary to be without merit. The Supreme Court in *Idaho Power* determined that the capitalization principle of § 263 overrides § 162. Florida Power has already stipulated to that the trenching costs were expenses to install under-

ground equipment that has a useful life in excess of one year. As such, Florida Power has stipulated to all the requirements of § 263. Therefore, § 263 must override § 162, even if it does meet the ordinary and necessary business requirements of § 162.

### 2. Capitalizing the Trenching Costs onto the Underground Extension Facilities and Depreciating Them over Their Useful Lives Does Not Violate the Matching Principle.

Florida Power's argument that the capitalization of the trenching cost would violate the "matching principle" is also unfounded. Florida Power quotes *INDOPCO* for the purpose of the matching principle: "to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes." *INDOPCO*, 503 U.S. at 83, 112 S.Ct. 1039. Following this definition, it appears that the capitalization of the trenching costs would not violate the matching principle. The trenching costs are incurred to install facilities into the ground so that Florida Power can sell electricity to customers for many years to come. If the extension facilities were not installed, then Florida Power would not be able to collect any revenue from the customers. By capitalizing the trenching costs as part of the cost of the underground facilities, Florida Power will be allowed to depreciate those assets over their useful lives—the same years that revenues from those customers will be earned.

Florida Power nevertheless complains that because the FPSC will not permit inclusion of the trenching costs into Florida Power's calculation of monthly fees charged to customers, the only revenue derived from the trenching costs is the underground EFC's and REUE charges. Therefore, Florida Power argues that the matching principle is violated because Florida Power will not be able to deduct the trenching costs currently against those taxable revenues. However, as noted above, without the extension facilities. Florida Power would not generate any revenues from customers. Additionally, Florida Power does not contest that all the other expenditures related to the installation of the extension facilities which are also not included in the monthly rate calculation should be capitalized under § 263, nor that the actual equipment placed into service by the trenching costs should be capitalized. Florida Power only makes the argument that the trenching costs are somehow different from all the other installation costs, and therefore should be currently deductible. Section 263 requires all the expenditures made to place a capital asset into service be capitalized as part of that asset. The trenching costs are expenditures to place the underground facilities into service. Since the underground facilities have already been determined to be capital assets, the trenching costs must be capitalized as part of those underground facilities under § 263. *See Union Hollywood Water Co. v. Carter*, 238 F. 329 (9th Cir.1917) (finding that expenses related to installing connections and pipe extensions were not deductible because they were invested in permanent improvements, which tend to enhance the rental and market value of the water system); *see also Idaho Power*, 418 U.S. at 13, 94 S.Ct. 2757 (holding that depreciation on equipment used to construct transmission lines, distribution lines, and connecting facilities must be capitalized as part of those assets); *see also Mountain Fuel Supply Co. v. U.S.*, 449 F.2d 816 (10th Cir.1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972) (the costs to rehabilitate segments of its piping system, including digging trenches, must be capitalized). The Court finds that the

capitalization of the trenching costs does not violate the matching principle.

### 3. The Uniform System of Accounts' Treatment of the Extension Facilities Does Not Properly Reflect Income or Expenses.

Florida Power also argues that it should be allowed to currently deduct the trenching costs because the Uniform System of Accounts (mandated by the FPSC) requires all expenditures related to the underground facilities to be excluded from its capital asset accounts to the extent that it receives underground EFC's or REUE charges. (Dkt.37, pp.39–40). The court in *Idaho Power* stated that "where a taxpayer's generally accepted method of accounting is made compulsory by the regulatory agency *and that method clearly reflects income,* it is almost presumptively controlling on federal income tax consequences." 418 U.S. at 15, 94 S.Ct. 2757 (emphasis added).

Florida Power has stipulated that the overhead EFC's and REUE charges should have been included income, even though the Uniform System of Accounts requires these amounts to be excluded from income. The Eleventh Circuit has likewise previously found that the FPSC's Uniform System of Accounts does not clearly reflect income for tax purposes. *See City Gas Co. v. Comm'r,* 689 F.2d at 949 (finding that the FPSC's required Uniform System of Accounts which treated customer deposits as liabilities did not clearly reflect income and therefore was not binding for tax purposes). For all of the reasons discussed above, the Court finds that the Uniform System of Accounts does not clearly reflect income, and the presumption that the Uniform System of Accounts should control for tax purposes has been rebutted. Therefore, § 263 requires the trenching costs to be capitalized.

### D. The issue of whether currently deducting the trenching costs would constitute a change in accounting method is moot, since the trenching costs are not currently deductible.

Finally, Defendant's argument that the Court's finding that the trenching costs are currently deductible under § 162 would constitute a change in accounting method under § 481 is moot because the Court finds that the trenching costs are not currently deductible.

## IV. CONCLUSION

Based upon the foregoing, it is **OR-DERED:**

1. Summary Judgment in favor of Defendant with respect to the taxability of underground EFC's for the tax years 1982 through 1985 is hereby **GRANTED;**

2. Summary Judgment as to Liability in favor of Plaintiff with respect to the taxability of underground EFC's for the tax years 1982 through 1985 is hereby **DENIED;**

3. Summary Judgment in favor of Plaintiff as to Liability with respect to reopening the tax years 1976 through 1981 under § 481 for the EFC's and REUE charges is hereby **GRANTED;**

4. Summary Judgment in favor of the Defendant with respect to reopening the tax years 1976 through 1981 under § 481 for the EFC's and REUE charges is hereby **DENIED;**

5. Summary Judgment in favor of the Defendant with respect to the current deductibility of the trenching costs is hereby **GRANTED;**

6. Summary Judgment in favor of the Plaintiff with respect to the current deductibility of the trenching costs is hereby **DENIED;**

7. The Parties will submit an agreed proposed final judgment in conformity with this ruling.